### FRANK CARTER V. STATE OF NEBRASKA

FILED MARCH 9, 1927. No. 25442.

1. **Criminal Law: TEST OF INSANITY.** "The test of insanity, urged as a defense to a charge of crime, is the capacity of the accused to understand the nature of the act committed and his ability to distinguish between right and wrong." *Kraus v. State,* 108 Neb. 331.

2. ———: **ADDRESS OF COUNSEL: OBJECTIONS: REVIEW.** Ordinarily, when error is predicated upon the claim that counsel in addressing the jury abused his privilege, to be available on appeal, the objectionable remarks must have been excepted to at the time and a ruling had thereon.

3. **Evidence** examined, and *held* sufficient to sustain the verdict and judgment.

ERROR to the district court for Douglas county: CHARLES A. GOSS, JUDGE. *Affirmed.*

*John N. Baldwin* and *James H. Walker,* for plaintiff in error.

*O. S. Spillman, Attorney General,* and *Lloyd Dort, contra.*

Heard before DEAN, DAY, GOOD, THOMPSON and EBERLY, JJ., BLACKLEDGE and SHEPHERD, District Judges.

DAY, J.

Frank Carter, hereinafter called defendant, was convicted in the district court for Douglas county of murder in the first degree for the killing of Austin D. Searles, on February 17, 1926, and in response to the verdict was sentenced to suffer death.

Alleging there was prejudicial error upon the trial, the defendant, as plaintiff in error, has brought the record of his conviction to this court for review. The information was in the usual form and in substance charged the defendant with shooting and killing Austin D. Searles in Douglas county, Nebraska, while defendant was engaged in an attempt to rob said Austin D. Searles. Counsel for defense in their brief state: "In the case at bar, it is undisputed that plaintiff in error killed Austin D. Searles on the date

alleged, but according to the theory of the defense the purpose was not robbery, the defense being that defendant was insane and did not know the difference between right and wrong as to the particular act for which he is on trial." The principal argument advanced by defendant's counsel is that the verdict is contrary to the evidence and cannot stand because the testimony so overwhelmingly discloses that defendant was insane at the time of the homicide.

Dr. Harrison Wigton was called as a witness on behalf of defendant and, after qualifying as an expert in nervous and mental diseases, testified that he had had defendant under observation for about a week for the purpose of determining his mental condition. He said: "I found that he is mentally deficient, not on the intellectual side, but on the moral side; that he is what we call a moral imbecile, having the intellectuality of an adult and even greater than ordinary intellectuality as far as memory is concerned, but with the moral ideals of a child ranging from three to seven years." He also testified that he found "evidence of profound urges" and paranoia, both of which he describes as mental deficiencies. As the result of his examination, he testified that in his opinion the defendant did not know right from wrong with respect to the act of killing Dr. Searles. He was asked a long hypothetical question based on the evidence which detailed a history of the defendant, and in response thereto stated that in his opinion the defendant was insane and did not know the difference between right and wrong with respect to the act charged.

Dr. G. E. Neuhaus was also called as a witness by defendant and, after qualifying as a specialist in nervous and mental diseases, testified that he had had defendant under observation and examination for ten days; that, as a result of his examination, he determined that defendant was suffering from a mental disorder and, at the time of the killing of Dr. Searles, defendant did not know the difference between right and wrong with respect to that act. His diagnosis was practically the same as that of Dr. Wigton. The witness also testified, in response to the same hypothet-

ical question asked of Dr. Wigton, that defendant did not know the difference between right and wrong with respect to the act of which he was charged.

The state called Dr. Alexander G. Young, who for a number of years has been the physician on the board of insanity· for Douglas county. He qualified as a specialist in nervous and mental diseases and detailed a wide experience with such diseases. He examined defendant, and among other things stated: "I found that the man was of the approximate age of 46; that physically he seemed in good condition; that he presented no signs of organic nervous disease; that in his behavior, in talking to him, he responded readily to all questions; that he talked rationally in answer to my questions; that he gave the history of his life, of his experiences, of his ideas, which indicated to me that he belonged to a type of mind which is of a varied character, which is generally classed, for lack of a better name, as being a psychopathic personality; that he presented, as far as his statements given me were concerned, an appearance of lacking moral ethical sensibilities. He seemed to be self-centered; he showed in his history emotional reactions of both normal and of a deviating type, which we find in this group of individuals; he showed no delusions; he had no hallucinations, which are some of the principal signs of insanity; he appeared to be able to plan; he stated that he knew the difference between right and wrong; that he realized the consequences of his acts as he was planning the acts of robbery which he committed. I gained the impression while I was talking to him that he was not giving me all of the facts that would have a bearing upon his life. I think that is all." Based upon his observation of the defendant and also upon the hypothetical question, the witness was of the opinion that defendant knew right from wrong with respect to the act of killing Dr. Searles.

On the trial, defendant was called as a witness in his own behalf. probably for demonstration purposes or for laying the foundation for a hypothetical question. He gave a remarkable account of his life, detailing events commencing

when he was six years old. He stated that at one time he had a dispute with his employer over a small amount of money which he claimed was due him for wages, and after a lapse of several years he visited the locality of his former employer and in a spirit of revenge shot and killed two dumb animals belonging to him. For this act, he was sent to the penitentiary. After being released from there, he wandered over the country, working at odd jobs and farm labor. In February, 1926, he returned to Omaha where he had previously lived. He had secured a 22-caliber Reising gun with a silencer attached and engaged in holding up and robbing people in Omaha. He described how, a short time before the killing of Dr. Searles, he tried to hold up a Mr. McDevitt; that the latter, instead of complying with the request to hold up his hands, turned to run away and thereupon he shot and killed him. A few days later, he shot through a window of a drug store, his object being to lead the police to believe that the man who was doing the shooting lived in that neighborhood.

With respect to the killing of Dr. Searles, he stated that he had previously been in Dr. Searles' office and knew the surroundings; that he went over there to rob him. On the night in question, he called at the office and told the doctor that he wanted to show him something. The doctor invited him into his private office and locked the door. As he was doing this defendant took out his gun and commanded the doctor to hold up his hands, and, when the doctor attempted to escape, shot and killed him. He then picked up the doctor's watch, which had fallen from his pocket, and after locking the door made his escape. He stated that he did not engage in the hold-up business for the purpose of obtaining large sums, that all he wanted was enough money to supply his needs, which were few. In trying to escape, he went to Council Bluffs and into the railroad yards, where he was accosted by a railroad detective and shot him. He was arrested in the vicinity of Bartlett, Iowa, and had in his possession his silencer gun and Dr. Searles' watch. He

detailed many other circumstances unnecessary to relate as bearing upon the particular question before us.

Whatever may be the rule in other jurisdictions, as to the degree of insanity as a defense for crime, it is well established in this state that the test is the capacity of the accused to understand the nature of the act committed and his ability to distinguish between right and wrong with respect to it. *Kraus v. State*, 108 Neb. 331; *Schwartz v. State*, 65 Neb. 196; *Philbrick v. State*, 105 Neb. 120 The court correctly instructed the jury on the question of insanity.

In the brief, some criticism is made of remarks of the county attorney in his address to the jury. No exception was taken to the remarks at the time; the court's attention being called thereto for the first time in the motion for a new trial. It has been repeatedly held that abuse of privilege by counsel in addressing the jury, to be available on appeal, must be excepted to at the time. *McLain v. State*, 18 Neb. 154; *Hill v. State*, 42 Neb. 503; *Hanks v. State*, 88 Neb. 464; *Goldsberry v. State*, 92 Neb. 211.

A strong appeal has been made to us to reduce the penalty from death to life imprisonment, as we may do under section 10186, Comp. St. 1922. If reliance is to be placed upon the verdict of the jury as to the insanity of the defendant, his crime was deliberately planned and executed in cold blood. If the extreme penalty is justified at all, it would seem that the facts before us are amply sufficient to call for the exercise of such penalty. We see no reason for interfering with the judgment of the district court, and it is therefore affirmed. Friday, June 24, 1927, between the hours of 6 a. m. and 6 p. m., is fixed as the date for carrying out the judgment of the court.

AFFIRMED.

Note—See Criminal Law, 16 C. J. 100 n. 12; 17 C. J. 62 n. 94—13 R. C. L. 710—10 L. R. A. N. S. 999.