HENRY SHERMAN V. STATE OF NEBRASKA.

FILED FEBRUARY 18, 1929. No. 26742.

*E. M. White,* for plaintiff in error.

*O. S. Spillman, Attorney General, Lloyd Dort* and *W. A. Prince, contra.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD and DAY, JJ., and ELDRED and REDICK, District Judges.

GOSS, C. J.

Henry Sherman was tried and convicted of murder in the first degree. The jury fixed the penalty of death. From a judgment on the verdict the defendant prosecutes error.

The case as now briefed and argued orally presents unusual features in this: While counsel for the defendant tried the case well and preserved his record of objections to evidence, incorporated all legal exceptions in the motion for a new trial, set them forth in his petition in error and duly grouped them in his assignment of errors in his brief, yet none of these are authoritatively invoked save that the judgment is excessive because it exacts the death penalty against a defendant as to whose sanity there is asserted at least a grave doubt. We quote a part of the conclusion of the brief:

"In conclusion let me repeat: I would not have this defendant turned free if I could do so. Neither do I argue that the case be reversed and sent back for another trial. I believe the defendant to be a dangerous person and that he would always be a menace to those with whom he might associate. But with a firm conviction in mind that this poor wretch is a maniac, and that it would be a judicial wrong to kill him, I ask that the evidence be carefully con-

sidered by this court; much of it I have been unable to call special attention to in this brief. And if, after full consideration of the same, there is a doubt in the minds of the court that defendant was mentally responsible, that you will resolve that doubt in his favor, and in the spirit of the law of our state, as well as of that Supreme and Divine law, not exact his life as the penalty, but direct that he be confined during the remainder of his life where he can be restrained from further violence to others, and the law be fully satisfied."

We commend the ethical and professional attitude of defendant's counsel maintained throughout the trial and review of this case. It was reciprocated by counsel for the state. All connected with the case seemed to unite in a desire to discover the truth and to apply the law. In the same spirit we approach our own duty and exercise our own responsibility.

Before complying with defendant's request to review the evidence, we deem it proper to record that we have considered the errors assigned and are convinced that, even if they were argued and insisted upon, they are not such as to predicate a reversal. The rulings on evidence and the instructions of the court show no prejudicial or reversible error. The legal rights of the defendant were carefully guarded by the trial court.

The information was drawn in the old-fashioned and involved way much in vogue prior to *Nichols v. State*, 109 Neb. 335, in which a brief form of information for murder in the first degree was set out. We commend its adaptation and use. The information in the instant case charged, in effect, that in Sheridan county, Nebraska, on May 18, 1928, the defendant, Henry Sherman, feloniously, purposely and of his deliberate and premeditated malice, shot Hattie Pochon with a shotgun, and as a result thereof Hattie Pochon died on said day; and that defendant thus committed murder in the first degree.

Roger Pochon and his wife, Hattie Pochon, both about 36 years of age, resided in Sheridan county, on a farm

about 17 miles south of Rushville, the county seat. They had seven children, all living with them, the eldest a daughter born January 1, 1914, and the youngest a baby six weeks old. Roger Pochon's mother, Eugenie Pochon, age 56, also made her home with them. On the morning when the killing occurred all the family were there. They lived in a two-story house. There were four rooms, besides a bathroom and pantry, downstairs, and four bedrooms, a storeroom and a hall upstairs. The grandmother slept in a bedroom downstairs and the rest of the family slept upstairs. The defendant was continuously employed by Roger Pochon during his lifetime from the 26th of February, 1928, as a farm hand, and lived with the family during the period of his employment. He had previously worked for Mr. De Poorter, a neighbor, about four miles nearer to Rushville.

At the time of the trial the oldest surviving member of the Pochon family was the eldest daughter. She was a witness for the state and her statement of the facts is not in any way impeached. On the night of May 17, 1928, she had accompanied Felix and Clementine De Poorter, son and daughter of their neighbor, heretofore mentioned, to a dance at the schoolhouse some miles away. They brought her home late at night, and she went to bed in her room, which was also occupied by two of the younger children. About 6 o'clock in the morning she was awakened by a shot downstairs. It was followed by two or three other shots. She heard her mother cry, "Don't shoot, don't shoot," and then her mother screamed. Then she heard the baby cry. She was frightened and ran to the head of the stairs. She saw her father lying face downward at the foot of the stairs; she could not see her mother, grandmother or the baby. Thereupon the defendant came up the stairs, ordered her to her room, pointed the shotgun, which belonged to her father, at her and said he would kill her if she did not go into her bedroom. She entered her room. He went downstairs, but came back right away. While he was gone she heard a sound as if "he

hit the baby on the floor." He entered the room and ordered her little brother and sister from the room and drove them to the room where the other children were and shut the door on them. He returned, having the gun with him at all times, took off his shoes and overalls and forcibly raped her. He then stated he was going to kill her and himself, but he yielded to her persuasion not to kill her because she wanted to help take care of the children. He put on his clothes, had her dress herself, and he threw a dress over her head, saying he did not want her to see the bodies downstairs. Thus clothed, she followed him downstairs, out of a door near the foot of the stairs, and when she got out-of-doors she removed the dress from her head and obeyed his command to go out and get into her father's sedan automobile which was in the garage. She backed it out and then he drove it. He said he was going to town to give himself up. They went first to the home of Clifford Davis, about a mile and a half away. Defendant drove into the yard, honked the horn, and when Mr. Davis came out informed him that he had killed the family and the children were upstairs in a bedroom. Defendant then drove her to Felix De Poorter's, telling her on the way that he was crazy, and informing her also that on the night before he had intercourse with a girl at Rushville. At De Poorter's, Felix came out to the car, she got out and went into the house and defendant and Felix drove away toward Rushville in the sedan. She was taken home in the De Poorter car.

Prior to May 18 defendant had on several occasions made improper proposals to her and she had always rejected them. He had tried to take liberties with her and she had repelled him. Twice she had told her mother. The last attempt was two or three days before the 18th of May. She had told her mother about it and her mother had told the father right away.

Clifford Davis testified that when the defendant drove up to his house he called to witness and said: "I have had a crazy streak and killed the Pochon family and I want

you to take care of the kids. I am going to Rushville and give myself up." Davis left with his hired man, Dave Rodgers, and was at the Pochon home within 15 minutes after defendant had notified him. He saw Roger Pochon lying face downward at the foot of the stairway in the dining room, saw Eugenie Pochon, his mother, lying right by the table, flat on her back with her arms up over her head, saw Hattie Pochon, his wife, in the northwest corner of the dining room "just slumped up, like she had fell in the corner there, laying on her face," and saw the baby lying by a chair by the west window. Witness at once went to the telephone in the dining room and called the sheriff. While he was calling he was informed by Rodgers that Roger Pochon was still alive, and so witness telephoned the doctor. As soon as he was through talking, he rolled Roger over, loosened his belt, and tried to help him as best he could. Roger's right arm had been half shot away; he had a bad wound in the chin, and a large hole between the shoulder blades. Eugenie Pochon was dead. She was shot through the face. Her chin was still there, but the shot "seemed to strike about the lower ear and went straight through." Hattie Pochon was shot in front of the ear and the back part of her head was blown away. Part of the brain was gone. The baby was wrapped in a blanket and was alive and crying. There were no chairs tipped over. The room was clean, with the exception there was a good deal of blood over the room. There are facts from which the jury might have concluded that Roger was shot first, that his wife was shot while trying to sound the alarm over the telephone, and that his mother was killed while trying to interfere with the killer's acts.

Felix De Poorter was ordered by defendant to "Get in the car" from which the Pochon daughter had just alighted at the De Poorter home, and he did so when she nervously said: "You had better get in." Witness thought Roger Pochon or somebody at the ranch was hurt and so he entered the car and defendant drove it toward Rushville, saying he was going to town to give himself up. He had

a shotgun next to him in the car and said: "Don't touch that gun or I will kill you deader than hell, for I have got another gun in my pocket." After driving about two miles witness threw the gun out, defendant not objecting. On the way, the defendant "started singing. I don't know what he sung and he hadn't more than got started when he said, 'Oh hell, I have got the two mixed together,' so he quit." Shortly thereafter they met the deputy sheriff in a car and defendant recognized who it was but kept on driving. The defendant said he could get away if he wanted to but was going to give himself up. The deputy turned his car around, overtook and stopped the sedan, ordered defendant into the other car and took him to town.

Dr. W. H. Crawford, physician and surgeon, of Rushville, testified that he went out to the ranch, arriving about 8 o'clock, the morning of May 18. Roger Pochon had died of his gunshot wounds just before he arrived, Roger Pochon's mother was dead, Hattie Pochon had been dead about two hours. She had a slight wound, but not fatal, through the right breast; "the second shot was evidently through the right eye and the brain, taking about half the brain out, and the eye, and tearing the ear some; it was a mortal wound instantly fatal." The baby was in a semi-conscious state. She had no external and visible wounds, but the doctor on examination discovered a depression at the base of the skull. He took the eldest daughter back to town with him and examined her, with the result, without details, that he discovered complete evidence of recent penetration and rupture, supporting her testimony relating to her criminal assault by the defendant.

Lawrence Lulow had driven over to the Pochon ranch about sundown May 17, 1928. There the defendant asked him to go to Rushville and offered to pay the expenses. They went, attended graduation exercises a while, visited a pool hall, ate at a restaurant, were entertained by two girls at their place, got his tank filled with gasoline and went home. While in town defendant inquired if the hardware store was open, but it was not.

The state introduced in evidence a written admission made on May 18 in the presence of several witnesses. It was typed in the presence of defendant and witnesses, in narrative form each statement in it being the result of questions and answers, but put in type after the narrative conclusion on each point was made satisfactory to defendant. The entire statement was considered and approved by defendant at the time of signing. In this the defendant narrated the time and manner of shooting the three members of the Pochon family; he intended to kill them at 1 o'clock the night before when he returned from Rushville, but finally weakened and went to bed instead; before going to bed he loaded the gun with six shells and put three shells in his pocket; got up about 5 o'clock in the morning and at breakfast time shot the three and then took the baby by the body and beat its head over a chair in the diningroom because it was crying and he thought it might have been shot; the defendant then admits his conduct with relation to the daughter as testified to by her; he says his motive for committing the crimes of murder in killing Roger, Eugenie and Hattie Pochon was for the purpose of having sexual intercourse with the daughter, and for the further reasons that he liked her and thought if something happened to her people she would get their property and he might be able to enjoy it with her; and because her parents would not permit him to court her, objecting on the ground of her age.

Defendant's brother testified that defendant was born October 6, 1906. If that be the correct date of his birth, he was between 21 and 22 years old when the crime was committed. His father lives in Burwell. His mother died when defendant was 10 or 11 years old. There were eight children living. For about a year after his mother's death the defendant lived with a brother eight or ten miles from Burwell, and from that period has lived at different places, frequently with others than relatives. The testimony would indicate that he was a good worker. He never went to school very much, as he did not like it. Some years ago

he was sent to the industrial school for some minor infraction. The indications are that he desired to go. His father, a laborer, was a hard drinker in the defendant's own early childhood, but for the last ten years, since the beginning of the prohibition era, he has not been so. Defendant drank some, but the evidence does not show that he was a slave to the habit. His general conduct seems to have been that of the average youth during the time he lived in the neighborhood where he committed the crime with which he was charged.

Defendant's brother and brother's wife testified that, when a boy 10 or 11 years old, he would go in the dark among the hills and pretend that he had been pursued by imaginary enemies, and that this argues insanity. Those who have been fortunate enough to have children, those who have taught children, those who understand children, all know that a belief in fairies, sprites and hobgoblins is inherent in many children and does not have to be inculcated. To those who do not comprehend them, such children are rivals of Munchausen; to those who understand child life their stories are but normal manifestations of the creative literary instincts of rational childlike minds. But romancing or lying in childhood does not connote insanity in maturity. Nothing strange or queer in the defendant has appeared in his own personal history that would condone his homicidal act and deprive it of guilty intent. Mere atrocity does not, of itself, prove a disordered mind.

Various witnesses introduced on behalf of the defendant testify to eccentricities on the part of uncles of the defendant. One incident relating to defendant's mother was told wherein she is depicted as losing her temper without good cause and threatening a prospective daughter-in-law with a pair of scissors. Thus the defendant sought to present to the jury a history of insanity in the family. Physicians testified both on behalf of the state and of the defendant on the subject of defendant's mental condition. The asserted hereditary taint was presented to them in

hypothetical questions. To detail the evidence as to the facts and the conclusions of the experts wou!d serve no useful purpose. All of these matters were submitted to the jury, to whom the ultimate fact of the criminal responsibility of the defendant is committed under the law.

"The test of insanity, urged as a defense to a charge of crime, is the capacity of the accused 'to understand the nature of the act committed and his ability to distinguish between right and wrong with respect to it." *Kraus v. State,* 108 Neb. 331.

In *Carter v. State,* 115 Neb. 320, the rule was correctly stated on page 324, but in the first point of the syllabus, where the opinion quoted from the first point of the syllabus in *Kraus v. State,* 108 Neb. 331, it inadvertently omitted the last four words, "with respect to it." It is clear that the test of the capacity of one to commit a criminal act must be applied to the particular act as of the time when it was committed.

The appeal to us to reduce the penalty from death to life imprisonment is based on the authority to do that under section 10186, Comp. St. 1922. The defendant cites cases in which such a sentence has been so reduced by the court. Neither he nor the state cites the many instances where such action has been denied. The state declines to discuss the question on the theory that the responsibility is for the court. There can be no criticism of either the defendant or the state for their respective positions. We accept the responsibility, realizing that precedents are not of value and that in every instance the matter of judicial leniency is to be resolved on the facts and circumstances of the individual case.

To us it seems as if the jury arrived at a proper conclusion under the facts and under their oaths. No suspicion of error attaches to their verdict or to the judgment of the trial court. Under the law the test is that of criminal responsibility. This was correctly submitted to the jury. The case was taken to Dawes county on a change of venue. The jurors had no local prejudice. They found

that the defendant planned the killing, knew what he was doing when he committed the act and knew that the act was wrong. We find no sufficient circumstances in the life of defendant nor in his family history to impeach his sanity. There was ample evidence to show that he planned the crime and that it was in furtherance of his motives of pride and anger at the obstruction of his suit, of passion toward the object of his affections, and of acquisitiveness of property, a share in the possession of which he hoped to enjoy. That such results as he hoped for would not be likely to flow from his acts does not mean that he lacked sanity, as observation proves that sexual passion such as ruled him defies the rules of law and logic. The atrocity of his crime is no reason for thinking he was insane when he committed four major crimes, destroying three members of a household and violating another, and making a bloody shamble of a peaceful home. If the extreme penalty is ever justified, it seems to us that the facts here warrant it. We see no reason for interfering with the judgment of the district court and it is therefore affirmed. Friday, May 31, 1929, between the hours of six a. m. and six p. m. is fixed as the date for carrying out the judgment of the court.

AFFIRMED.