ROLAND DEAN SUNDAHL, PLAINTIFF IN ERROR, v. STATE OF NEBRASKA, DEFENDANT IN ERROR.
48 N. W. 2d 689

Filed July 5, 1951. No. 33008.

552

*Louis Lightner* and *Wilbur L. Johnson,* for plaintiff in error.

*Clarence S. Beck,* Attorney General, and *Clarence A. H. Meyer,* for defendant in error.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

SIMMONS, C. J.

Plaintiff in error, by information in two counts, was charged with murder in the first degree. The first count was that he killed a 16-year-old girl in the perpetration of or an attempt to perpetrate a rape. The second count was that he purposely and of deliberate and premeditated malice killed the girl. To these counts he pleaded not guilty and not guilty by reason of insanity or mental derangement. Trial was had. The jury found the plaintiff in error guilty of murder in the first degree on count one and fixed his punishment at death. Motion for a new trial was made and overruled, and plaintiff in error was sentenced. He brings the matter here on petition in error. We affirm the judgment of the trial court.

The plaintiff in error will be hereinafter referred to as defendant. The girl whom the defendant is accused of murdering will be referred to as deceased.

The crime was committed on the 27th day of August 1950, near Columbus, Nebraska.

We summarize the evidence as it came from the lips of witnesses, from two written confessions of the defendant, and from his own testimony at the trial.

At the time of her death the deceased was 16 years, 8 months old. Her home was in a town near Columbus. She was a normal, intelligent girl. She had finished the eleventh grade in school and expected to go to school the following year. She went to Columbus, and secured employment in a drive-in cafe where she worked in the late afternoon and well into the night as a waitress for about a month preceding her death. She roomed with a lady in a home. Sometimes she went to her own home on the day of each week that she was not working.

The defendant was born in June 1930. His parents lived in Nebraska. At birth he had a cyst on his neck. This was operated on and removed when he was 4 years old and he was again operated on for the same thing in 1949. He had the usual children's diseases. He went to school, completing the eighth grade. He lost interest in school when he was in the ninth grade. In 1946, he enlisted in the U. S. Marines. There is reference to service also in the Army. He was discharged after 18 months' service in the Marine Corps. While in the service and at the age of 17, he was married on October 17, 1947. Two children were born to the marriage. He received a discharge and came to Nebraska and Norfolk in June 1949. His parents then resided there.

Defendant worked at odd jobs. He was unable or unwilling to keep permanent employment. The family lived in an apartment, then a house, and finally, in the summer of 1950, in a garage at the home of the parents. This was because of limited means. The marriage was a happy one until 1950, when there is evidence of discord between defendant and his wife. Beginning about June 1, 1950, defendant was away from home most of the time, working at odd jobs, and on

occasion sleeping in his car wherever he happened to be. During this period his activities centered in and around Columbus, Nebraska, where he established friendships with two other young men. He was an agreeable person to know.

During these months in 1950, there is evidence that he complained often of headaches, took medicine for relief, and became moody and depressed. In telling his life story to a physician who testified as an expert witness, he did not mention headaches.

Two days before the killing of the deceased, defendant's mother went to the county attorney at Norfolk, told him of defendant's absence and her fear for his mind, and asked that he be found and given a mental examination. She testified on cross-examination that her main reason for making this request was that he had not been supporting his family.

On August 26, 1950, defendant had returned from a trip to Oklahoma as the driver of a truck. He was about Columbus with his friends. Early that evening in a conversation about women he told an acquaintance that he was going to have intercourse if he had to rape somebody. Early that evening he undertook to "date" a waitress at the same cafe where deceased worked. They had not theretofore been acquainted. One of defendant's friends knew deceased and "dated" her for that night after she was through work.

Defendant owned a car. That evening defendant and his two friends drove to nearby towns. Defendant testified that if any woman in one town had thrown herself at them, they would have picked her up. They returned to Columbus where one of the friends went home. The defendant and the other went to the cafe where deceased worked and waited for her to be off duty. Defendant states in his confession that his friends told him deceased was a girl who would "put out." About 1:30 a. m., the two men and deceased left the cafe in defendant's car and drove about the park at

Columbus. Defendant stopped the car and left the other man and deceased in the car for about 5 minutes. Defendant testified that this was prearranged and gave the jury to infer that during that time defendant thought deceased and the other man had sexual intercourse in the car. Defendant and deceased then took the other man home. The defendant and deceased drove to Lake Babcock near Columbus. It was then about 2:30 a. m. They drove up on the roadway on the dam and parked the car. Defendant had a hatchet in his car. The evidence as to what happened there is in two self-written confessions of the defendant and the condition of deceased's body when found. In the first confession he stated that they sat in the car; that he made improper advances; that deceased resisted; that he choked her; that she went limp; that he opened the car door and she fell to the ground; that he picked up the hatchet and hit her; that he did not know how many times; that he threw the hatchet in the lake; that he pulled her to the bank and pushed her over; that he kicked some weeds on her and kicked dirt over the spot where she had bled; and that he did not have intercourse with her and did not know that she was dead. According to the testimony of one of the officers, defendant later explained to him that he thought that to constitute rape, the sexual act had to be completed. Defendant then gave the officers a second confession. In it he made the added statements that in addition to improper advances, he told deceased what he had heard about her; that both got mad; that he then choked her; that after she fell out of the car he tore off her clothes; that he hit her with the hatchet; and that he then attempted to rape her but could not do the act.

Defendant then went back to a filling station near Columbus where he arrived about 3:30 a. m. He there got coffee, said he had been fishing, asked to use the washroom to clean up, and was in the washroom for several minutes. He went to his car, returned to the

station later, and had coffee and visited. That morning police officers came to the station. He inquired of the attendant as to why they were there. He left the station about 7 a. m. By 9 a. m., he was back with his friends, spent the day visiting with them, went swimming, and drove that evening to the home of one of them. When asked about deceased he said he had let her out of his car about a block from a downtown hotel in Columbus. He left for Norfolk and his home about 10:30 that evening.

It does not appear that the absence of deceased caused concern to her employer or her landlady. On Thursday afternoon or evening a younger sister of deceased inquiring for her found that she had been absent since Saturday from her work and her room. On Friday deceased's mother went to Columbus, tried to locate her, and related her absence to the police. They investigated.

It was found that deceased was last seen with defendant. The officers went to Norfolk and took defendant into custody. He at first denied knowing deceased and denied that he had ever been in Columbus. He later admitted that he had been with deceased, said there had been an accident, and agreed to go with the officers to locate the body of deceased. He did so.

The water's edge was some 6 or 7 feet below the level of the road. The body was found about halfway down the slope, completely covered by weeds. It was naked, save for shoes and sox. Clothing was near it and one garment partly over it. The head was mashed in so that features were not recognizable and was severed from the body, save for a bit of skin. The blood spot was located about 20 feet from the body. The hatchet was later located and recovered at a point about 150 feet out in the lake.

Defendant testified at the trial. He insisted that parts of his confessions were suggested to him by the officers and that he wrote as they suggested. His testimony

indicates something of the philosophy of a fatalist. He had given study and thought to sex offenses and penalties. He testified as to many of the details of the events before and after the killing and while at Lake Babcock. He did not "remember" the details of the assault and killing.

The State and defendant each produced an expert witness. Both agreed that defendant's intelligence was above normal.

Defendant's expert testified that defendant had the emotional concepts of a child; that he was emotionally immature; that a person so constituted angered easily and without cause; that his thinking and acting were not in harmony; that he had difficulty in developing adult codes of ethics and moral concepts; and that he lived in a world of fantasy. The expert gave it as his opinion that defendant was mentally ill at the date of the killing and that that influenced and was the cause of the killing.

The State's expert witness detailed to the jury the story of defendant's life as related to him. He testified that defendant's memory was normal generally. He gave it as his opinion that the failure of defendant to remember the details of the tragedy was essentially defensive, rather than representative of the true state of his memory. He also gave it as his opinion that defendant was not insane and knew the difference between right and wrong at the time of the killing.

Defendant's wife and his mother testified as to facts of his behavior upon which they based an opinion as to his sanity. They stated, among other things, that he was kindly and considerate to people and animals. His mother stated that in her opinion defendant was not sane at the time of the tragedy. It was his wife's opinion that he did not know right from wrong at the time.

This brings us to defendant's argued assignments of error.

The information was filed in this case on September

28, 1950. On October 3, 1950, the court appointed counsel for defendant. The case came on for trial on November 27, 1950. On November 25, 1950, there was published in the Columbus Daily Telegram, on the editorial page under a caption "Letters to the Editor," a letter signed by a woman referring to this case. The letter referred to the public reaction between the first report of the crime and its prosecution, and stated that it followed the modern trend of becoming less an atrocity in the public mind; that the writer had a daughter and time could not eradicate the guilt of the offender should such a fate befall her; that the writer knew the sorrow of the parents of deceased was as pronounced today as of the time of the crime; and that the press had carried a story that the death penalty for a similar crime had never been meted out in Platte County, asked why not, and questioned that insanity was a factor to be considered. The letter further stated that public sympathy was not aroused for the family of the deceased and people did not want to see a killer die; and that the deceased did not want to die. The writer asked how long the people would go on encouraging such crimes by failing to cause the extreme penalty to be paid and asked if future rapists and murderers would not be more hesitant if they knew what the price of justice would be. The letter stated that in high school the writer had been opposed to capital punishment but now her opinions were reversed. She referred to a Bible statement that God punished two who lied by striking them dead and asked if He would be less severe with the sin of murder. The letter concluded: "I trust that when the Sundahl case comes before the public, there will still be those who remember the facts of the crime itself and the great need for justice in the fullest extent."

The defendant moved for a change of venue on account of the publishing of the letter. Defendant offered the paper as an exhibit. He proved the publication of the article and that the paper had a total paid circulation of

6,750, of which 4,475 was in Platte County. The defendant also stated that he felt there must be a great deal of prejudice on account of the article and asked for a continuance to the next term to make that showing. The two motions were overruled. Defendant assigns this as error.

The statute provides: "All criminal cases shall be tried in the county where the offense was committed unless it shall appear to the court by affidavits that a fair and impartial trial cannot be had therein; in which case the court may direct the person accused to be tried in some adjoining county." § 29-1301, R. R. S. 1943.

In this case no affidavits were presented and no showing was made otherwise that a fair and impartial trial could not be had. Statement of defendant's counsel does not show an effort to get such affidavits or make such a showing, but rather that they anticipated prejudice on account of the article and asked for time to investigate and make a showing. The rule is: "A motion for a change of venue in a criminal case is addressed to the sound discretion of the trial court, and its ruling thereon will not be disturbed unless an abuse of such discretion is disclosed." Simmons v. State, 111 Neb. 644, 197 N. W. 398. The motion for a change of venue was properly denied.

As to continuances, the rule is: " ' "An application for a continuance is addressed to the sound discretion of the trial court and its ruling thereon will not be held erroneous, unless an abuse of discretion is disclosed by the record." * * * It is no abuse of discretion for the trial court to refuse defendant a continuance unless it clearly appears that defendant suffered prejudice.' " Maher v. State, 144 Neb. 463, 13 N. W. 2d 641.

No showing of prejudice suffered is made. The motion for a continuance was properly overruled.

Defendant's next assignment of error is that the court erred in failing to admonish the jury as required by section 25-1110, R. R. S. 1943. The assignment in the

petition in error is not so limited. The statute applicable to criminal procedure is in part: "If the jury are permitted to separate during the trial, they shall be admonished by the court that it is their duty not to converse with or suffer themselves to be addressed by any other person on the subject of the trial, nor to listen to any conversation on the subject; and it is their duty not to form or express an opinion thereon until the cause is finally submitted to them." § 29-2022, R. R. S. 1943.

On the opening day of the trial and before the noon recess and before the jury had been finally selected, the court stated: "* * * I want to caution you that from now on during any recess you must be careful not to discuss this case among yourselves or with anyone else. Neither should you permit anyone to discuss the case in your presence. We do not want the jury to hear discussion or argument about the case outside the court room. Now you have not been sworn as jurors yet and some of the members of the panel may not be on the jury. You must all be careful not to discuss the case with anyone, and if anyone starts to discuss it in your presence tell them you may be a member of the jury and cannot listen to it. If anyone insists on discussing it report their name to the court."

Right after the jury was sworn, the court stated: "Gentlemen of the Jury—and this applies to the alternate—you have been selected to try this case as the jury. I will admonish you again, as I did this morning, to be very careful not to associate with anyone in the halls or allow anyone to talk to you or discuss this case in any way with you. You must also not discuss the case or any of the facts or any of the evidence between yourselves until the case is entirely concluded and you have received the instructions of the Court and retired to the jury room. In other words, keep your minds open until the evidence is entirely in. Do not discuss it with anyone or even among yourselves until you have retired

to the jury room when the case is entirely concluded."

As appears from the bill of exceptions, on other occasions the jury was told before recesses to remember the admonition given and on other occasions the court recessed without giving any admonition. The transcript, however, shows that the jury was "cautioned" or "duly cautioned" as required by law at each noon and evening recess during the four days of the trial. This appears to have been deemed sufficient in Ringer v. State, 114 Neb. 404, 207 N. W. 928. However, because of the variance between the bill of exceptions and the transcript, and because of short recesses where no admonition was given, we examine further into the matter.

The defendant did not ask for additional or different admonitions. The matter was in nowise called to the trial court's attention during the trial.

The contention here is that the admonition given does not meet the terms of the statute and that it should be given at every intermission. The purpose of the admonition is that· the jury be informed of its duties in that regard. The statute does not require an admonition each time the jury is permitted to separate. While repeated admonitions might be advisable, it cannot be assumed that they are necessary to impress the jury with its duty in that regard any more than in any other matter. It is not the number of admonitions but the fact of admonition that is important.

The contention is further advanced that the admonition to "keep your minds open until the evidence is entirely in" does not meet the requirements of the statute that "it is their duty not to form or express any opinion thereon until the cause is finally submitted to them." This language must be read in connection with the further admonition not to "discuss the case or any of the facts or any of the evidence between yourselves until the case is entirely concluded and you have received the instructions of the Court and retired to the jury room."

Webster defines "open-minded" as "Having an open

mind; receptive of arguments or ideas." Webster's New International Dictionary, Second Edition, Unabridged, p. 1706. It is further defined as "having an open mind, accessible to new arguments or ideas." The Oxford Dictionary, Vol. VII, Part 1, p. 139. It is also defined as "Having a mind open or accessible to new views or convictions; not narrow-minded; unprejudiced; liberal." The Century Dictionary and Cyclopedia, Vol. VI, p. 4120. Although we deem it better to admonish in the language of the statute, the admonition here given is in substantial compliance therewith and not prejudicially erroneous.

When the body of deceased was discovered, the weeds covering it were partly removed and a picture taken of it. The picture shows the back (from below the shoulders down to and including the hips) of a nude body. A part of one arm is shown. Indistinctly what appears to be an item of clothing is partly shown. The State offered the negative and the enlarged positive picture from the negative. They were received in evidence over objection.

Defendant contends that at all times he had admitted the act; that no issue was raised concerning any fact which the photograph made clear; that the State had ample direct testimony of the finding of the body; and that the only purpose and effect of the photograph were to inflame the passions and prejudice the jury against him. He relies upon Lee v. State, 147 Neb. 333, 23 N. W. 2d 316.

It is to be remembered that defendant pleaded not guilty as well as not guilty by reason of insanity or mental derangement. He put in issue every element of the crimes with which he was charged. It was not until after this picture was in evidence and a ring on the body identified as that of the deceased that defendant admitted that the body found was that of deceased. The State then stopped any further effort of identification. Before the picture was introduced the State's

witnesses had given a verbal description of what the picture represented.

We have recently again stated the rules applicable here:

"A photograph proved to be a true representation of the person, place, or thing which it purports to represent, is competent evidence of anything of which it is competent and relevant for a witness to give a verbal description.

"Where a photograph illustrates or makes clear some controverted issue in the case, a proper foundation having otherwise been laid for its reception in evidence, it may properly be received, even though it may present a gruesome spectacle.

"Photographs of the person or body of a deceased, proper foundation having been laid, may ordinarily be received in evidence for purposes of identification, or to show the condition of the body, or to indicate the nature or extent of wounds or injuries thereon." Turpit v. State, *ante* p. 385, 48 N. W. 2d 83.

The assignment is not sustained.

Section 28-401, R. R. S. 1943, provides that a person found guilty of murder in the first degree "* * * shall suffer death or shall be imprisoned in the penitentiary during life, in the discretion of the jury."

Several assignments of error relate to the application of this statute. Defendant requested an instruction that the jury had the right, if it imposed a penalty of imprisonment for life, to add a recommendation that defendant shall never be paroled, and that it did not have the right to inflict the death penalty where the facts justified life imprisonment only, for fear that the Board of Pardons might at some future time see fit to parole the defendant. This was followed by a statement of the composition of the Board of Pardons and its procedures. The trial court refused to give the instruction.

The record shows that argument was made to the jury. Counsel for the State in effect asked that the

death penalty be invoked so that the defendant be never again inflicted on society. The jury was instructed and retired from the courtroom. After that the defendant then referred to the closing argument of counsel for the State and objected thereto, and then moved that the instruction be given as requested above and particularly that the jury be instructed that it should not fear what the Board of Pardons might do. Defendant stated that he did not think the argument of counsel for the State was out of line but in view of it thought that the precautionary instruction should be given.

Defendant assigns as error the refusal to give an instruction on the parole procedure. The Board of Pardons is composed of officers of the executive department. § 29-2602, R. R. S. 1943. It shall not assume to act as a court of review "* * * but shall confine itself to a hearing and consideration of those matters only which properly bear on the propriety of extending executive clemency." § 29-2612, R. R. S. 1943.

Pardon or parole relates to something that may happen after conviction and to action by the executive department. The jury had nothing to do with relation to the punishment except to determine whether it should be death or imprisonment for life. In the event the decision was for life imprisonment, whether or not he should be later paroled or pardoned was not a matter for it to decide. The jury's task at that point was to choose between one or the other of the penalties. That decision should not rest upon whether parole was easy or difficult to secure. See, Lovely v. United States, 169 F. 2d 386; State v. Dooley, 89 Iowa 584, 57 N. W. 414; State v. Carroll, 52 Wyo. 29, 69 P. 2d 542. The trial court did not err in declining to so instruct.

Defendant requested an instruction to the effect that even though the jury found the defendant was not insane and was capable of understanding the nature of his act and the difference between right and wrong, yet

if his mind was not normal and no rational motive for the homicide appeared, then the jury would not be justified in inflicting the death penalty if it found him guilty of murder in the first degree.

Defendant also requested an instruction that the matter of the penalty was for the jury's discretion; that it could not act arbitrarily; and that gruesomeness was not a determining factor, but the moral turpitude, depending on mental condition at the time of the homicide, whether death of the victim was contemplated and other facts bearing on moral turpitude, should be considered.

Defendant assigns as error the refusal to give these instructions or some guide to the jury as to the penalty to be determined by them.

Prior to 1893 by our statute the penalty for murder in the first degree was death. § 5579, Cons. St. 1891. In 1893, the Legislature amended the act as above set forth. Laws 1893, c. 44, p. 385. In Winston v. United States, 172 U. S. 303, 19 S. Ct. 212, 43 L. Ed. 456, the Supreme Court of the United States reviewed the reasons for amendments such as that made in 1893 in Nebraska and construed a comparable statute of the United States, and held: "The act does not itself prescribe, nor authorize the court to prescribe, any rule defining or circumscribing the exercise of this right; but commits the whole matter of its exercise to the judgment and the consciences of the jury." This decision was followed in Andres v. United States, 333 U. S. 740, 68 S. Ct. 880, 92 L. Ed. 1055.

This decision has been approved and followed. See, Vickers v. United States, 1 Okl. Cr. 452, 98 P. 467; People v. Bollinger, 196 Cal. 191, 237 P. 25; Hernandez v. State, 43 Ariz. 424, 32 P. 2d 18; State v. Hunter, 183 Wash. 143, 48 P. 2d 262; State v. Peltier, 21 N. D. 188, 129 N. W. 451. See, also, State v. Van Vlack, 57 Idaho 316, 65 P. 2d 736; People v. Martin, 12 Cal. 2d 466, 85 P. 2d 880.

Defendant cites Commonwealth v. Brown, 309 Pa. 515,

164 A. 726, 86 A. L. R. 892. Language in that opinion gives support to defendant's contention. However, that court has since held that although the trial judge may if he so desires, and subject to the jury's sole power of ultimate decision, point out facts which in his opinion bear upon the question of the penalty, yet the court is not compelled to discuss the question of the penalty at all. Commonwealth v. Wooding, 355 Pa. 555, 50 A. 2d 328.

We are mindful that in Dinsmore v. State, 61 Neb. 418, 85 N. W. 445, the court gave an instruction in which several matters were discussed and, among others, stated that they had nothing to do with questions of mercy, and that that was a power vested in the executive department in the exercise of its authority to pardon. Objection was there made that the instruction invaded the province of the jury. We there held that it did not and that it was a cautionary instruction which the trial court may, in its discretion, give or not.

We find no error in the trial court's refusal to so instruct.

This brings us to matters presented by defendant in his motion for a new trial. He contended that the whole trial was charged with an atmosphere of hate and a desire for revenge and the death penalty.

Specifically he charged and presents here three things: First, that the trial was attended by large numbers of people all having the feeling of hate and revenge.

The trial consumed four days in the presentation of evidence. Our attention is called to one time when the court admonished the audience to "restrain yourselves from these outbursts." A witness was then testifying about an incident that occurred several weeks before the killing of deceased, when defendant, riding with a boy and two girls, drove his fist through a window in the car. What caused the outburst of the audience is not apparent. The admonition was voluntary on the part of the court. We find no record of any request

from the defendant or any occasion for other admonitions.

The rule is: "In the trial of a criminal action, where spectators applaud and counsel for defendant proceed with the trial, without objection and without request for a mistrial, and take chances of a favorable verdict, they will not be heard to complain of such fact, for the first time, on motion for a new trial." Wever v. State, 121 Neb. 816, 238 N. W. 736.

At the close of the trial and before argument to the jury the court expressed its thanks to the audience, stated they had been "very orderly," and cautioned them that there should be no applause or commotion during the argument. There is no showing that the admonition was not followed. In the showings hereinafter referred to, all jurors disclaimed having heard any discussions by spectators or others expressing any attitude or sentiment as to the guilt or innocence of the defendant.

The record showing these facts, we see no basis for a holding of prejudicial error in that regard.

Second: Defendant then offered two detective magazines purporting to recite the facts of this crime. That the recitals contained in them are at marked variance with the evidence in the record is apparent. There was a showing made that there was an unusually large sale of these magazines in Columbus prior to and during the trial. The State, by affidavit of each juror, made a showing that they had not seen or read the magazines. No showing to the contrary was made.

In a case where similar contentions were made with reference to the publication of untrue and inflammatory matter we held that "Opportunity for prejudice or disqualification is not sufficient to raise a presumption that they exist." Fisher v. State, *ante* p. 166, 47 N. W. 2d 349. In that case there was no showing that any juror had read or knew the contents of the publications. Here there was a showing that they had not. The charge

of prejudice based on these magazine articles is not sustained.

Third: The next contention is that several of the jurors had read the letter as published in the Columbus Daily Telegram and hereinbefore summarized. The defendant made à showing that six, or possibly seven, of the jurors were regular subscribers to the Columbus Daily Telegram and reintroduced the paper containing the letter.

The State canvassed the jury and, in the affidavits above referred to, produced a showing which the parties agree demonstrates that one of the jurors had read the letter before he was selected as a juror, and that four, and possibly five, jurors had read the letter in the paper during the progress of the trial while evidence was being taken.

The transcript shows that on November 6, 1950, the defendant made application to plead guilty to murder in the second decree. The penalty for murder in the second degree is imprisonment in the penitentiary for not less than ten years or during life. § 28-402, R. R. S. 1943. A hearing was had on this matter on November 15, 1950, and the application was denied. This occurred before defendant was arraigned and pleaded to the information. At the trial he was asked on direct examination if he had not offered to plead guilty to murder in the second degree and take a life sentence and he answered, "Yes sir."

In his argument defendant's counsel advised the jury that the only purpose of the prosecution was to determine whether or not the defendant should suffer the death penalty, and that he did not expect a verdict of not guilty by reason of insanity. He called attention to the offer to plead guilty and be imprisoned for life, and asked for a verdict that carried with it a life sentence. The State in its closing argument asked for a verdict that carried a sentence of death.

It is patent that the final issue to be decided by the

jury was whether the penalty should be death or life imprisonment. The published letter contained no recital of facts of the killing; it referred to the public apathy as to the atrocity of the offense; it was in effect an argument by an individual for the death penalty.

The record further shows that in ruling on the motions for a change of venue and a continuance, the trial court stated that "* * * probably any juror who can be shown to have read that article can be excused." The voir dire of the prospective jurors is not fully shown. The record contains a statement by counsel for the State (after both the State and defendant had passed the jury for cause) that the defense had not interrogated any of the jurors with reference to whether or not they had seen or read the article in question. Defendant's counsel then stated that the defense did·not wish to interrogate in regard to the letter because they believed it would call it to the attention of the jurors and that they would go home and read it. The record further shows that both the State and defendant waived the fifth challenge and did not exhaust the peremptory challenges authorized by section 29-2005, R. R. S. 1943.

Defendant assigns as error the failure to admonish the jury not to read that letter. It is obvious that the defendant in effect advised the court that he did not want it called to the jury's attention. Defendant does not argue that assignment. Pursuant to rule 8 a 2 (4) of this court, the assignment will not be further considered.

Defendant's assignment of error here is that prejudice requiring a reversal and a new trial flows from the fact that four of the jurors read the letter during the trial.

We have here then this situation. Defendant knew of the publication of this article before trial. He urged it as a basis for motions for a change of venue and a continuance. The trial court in denying those motions indicated that if it were disclosed on voir dire that any prospective juror had read the article, it might be ground for challenge for cause. Defendant did not question

any prospective juror as to that matter. He elected to take a chance that the jurors had read it and to take a chance on the prejudice, if any, which might follow, rather than to direct attention to it and to permit the jurors to know of defendant's concern about it. In doing so and advising the court of his reason, he impliedly asked the court not to mention it and produced a situation where, had the court done so, it might then have been subject to the charge of prejudicial conduct. As a result, one juror who had read the letter was passed for cause and served on the jury.

Defendant here concedes that the failure to question that juror was "perhaps a waiver as to him." See Kitts v. State, 153 Neb. 784, 46 N. W. 2d 158. He assigns here as error only the reading of the article by the four jurors after the trial began. The time of the reading is not the important consideration here but the fact of the reading. It is not the number of jurors who read it but the fact that it was known to a juror that constituted the prejudice, if any, that was to follow. When the defendant elected not to interrogate the prospective jurors as to whether or not they had read the article, he waived not as to the one juror who had read this article but the prejudice, if any, that might arise from the fact that one or more of the jurors might have knowledge of the contents of the letter.

Polin v. State, 14 Neb. 540, 16 N. W. 898, involved a first degree murder case and a death sentence. There it was shown that in disobedience of a court order and during trial, three of the jurors separated from the others and engaged in conversation with bystanders. Defendant's counsel knew of it, made no complaint to the court, and trial proceeded. Objection was made in motion for a new trial. We held that it came too late. It was held that if it was thought prejudicial, it should have been called to the court's attention when done. We there said: "Parties litigant, even defendants in criminal cases, must deal fairly by the court. They are not

permitted to withhold information of matters transpiring in the progress of a trial, whether prejudicial or otherwise, and thus, without objection, permit it to proceed to a conclusion, and then take advantage of them. Generally all objections not jurisdictional as to the subject of the litigation must be made at the first opportunity, or they are deemed to be waived. The rule in such cases is, that a party shall not be permitted without objection to take the chances of a favorable result, and then, if disappointed, for the first time complain." This holding was followed in Sedlacek v. State, 147 Neb. 834, 25 N. W. 2d 533, 169 A. L. R. 868. It is applicable here. See, also, Cochran v. State, 122 Neb. 79, 239 N. W. 471; Hanks v. State, 88 Neb. 464, 129 N. W. 1011; Zorn v. State, 123 Neb. 596, 243 N. W. 841.

Sections 25-1623 and 29-2006, R. R. S. 1943, specifically refer to questions arising where prospective jurors have read newspaper accounts and statements and the conditions under which they may be challenged for cause. As we said in Kitts v. State, *supra*, these provisions manifest that voir dire furnishes defendant ample opportunity to establish whether or not prospective jurors have been prejudiced by such articles. The sections are cited here to show that the reading of such matters is not prejudicial per se.

The rule is: "Whether a motion for a new trial in a criminal case, based on alleged misconduct of jurors, should be sustained rests in the sound discretion of the trial court, and its ruling on such motion will not be disturbed unless an abuse of discretion is shown." Simmons v. State, *supra*. See, also, Murray v. State, 119 Neb. 16, 226 N. W. 793; Matters v. State, 120 Neb. 404, 232 N. W. 781.

In Tracey v. State, 46 Neb. 361, 64 N. W. 1069, in support of a motion for new trial, an affidavit was filed of misconduct of jurors in that in their deliberations they had been told facts not produced in evidence. The statements made in the affidavit were not denied by the

State. We there held: "The district court, in trying the issues presented by the motion for a new trial, had the right, if it was not obliged, to indulge the presumption that the jurors had been mindful of the oaths which they took, and had found the verdict which they had solely upon the evidence introduced on the trial of the case. * * * The law supplied, by presumption, the evidence on the one hand that the jurors had obeyed their oaths." It was further held that the court could weigh the presumption against the showing made in the affidavit. This decision was followed in Savary v. State, 62 Neb. 166, 87 N. W. 34, and in Hanks v. State, *supra.*

For the decisions of other courts dealing with a similar contention see State v. Danner, 70 Mont. 517, 226 P. 475; Langer v. United States, 76 F. 2d 817; Bratcher v. United States, 149 F. 2d 742; United States v. Reid, 12 Howard 361, 13 L. Ed 1023.

We conclude that the trial court did not err in denying the motion for a new trial based on this contention.

Finally defendant contends that he did not have a fair trial because of the matters hereinbefore determined and also charges that the State made a studied effort to emphasize the gruesome details of the homicide and the condition of deceased's body when found, rather than an orderly examination of defendant's mental condition, he "having at all times admitted the killing and all the details thereof." We have heretofore pointed out that the defendant put in issue by his plea of not guilty every material element of the crimes charged. We have examined the State's evidence. It did no more than was required to properly prove the commission of the offenses charged. We have also pointed out that when the defendant made an admission during the trial, the State accepted it and refrained from offering additional proof of the fact. admitted. True, defendant had written and signed two confessions. But the not guilty plea stood as against those confessions until the defendant testified. He then un-

dertook to repudiate the confessions in part by contending that statements therein were put into his mouth by officers, and that he did not remember what happened as detailed in the confessions and did not fully realize or clearly remember what he had done.

Defendant had the services of competent and diligent counsel, experienced both at the bar and on the bench of this state. The trial was before an able trial judge. That defendant had a fair trial generally is well illustrated by the fact that he makes here only one assignment of error on the admission or rejection of evidence and no assignments of error on the instructions given to the jury. Our study of this record convinces us that he had the fair trial which the law contemplates and requires.

As hereinbefore pointed out, section 28-401, R. R. S. 1943, provides that upon conviction of a person of murder in the first degree the jury shall in its discretion determine whether the penalty shall be death or imprisonment for life. By that act the Legislature provided that the jurors who heard the testimony, observed the witnesses, weighed the evidence, and determined the guilt should have the primary duty to fix the penalty.

Section 29-2308, R. R. S. 1943, provides: "In all criminal cases that now are, or may hereafter be pending in the Supreme Court on error, the court may reduce the sentence rendered by the district court against the accused, when in its opinion the sentence is excessive, and it shall be the duty of the Supreme Court to render such sentence against the accused as in its opinion may be warranted by the evidence."

Defendant, relying on this section, asks that the sentence be reduced to life imprisonment. This is based on either of two general propositions. He appeals for clemency and mercy for himself and more particularly for his family. His second contention is that his evidence as to his age, his previous life, his good qualities, the changes that came over him in the months before the

killing, and his mental condition prior to and at the time of the offense do not justify the extreme or death penalty.

Shortly after the adoption of the act we had this section before us for construction and application in Anderson v. State, 26 Neb. 387, 41 N. W. 951. As to the first proposition we there held that the act of reducing the sentence and rendering a new one in accordance with the evidence is in no sense a commutation nor the exercise of clemency and that that was a matter of executive discretion. This decision was quoted with approval in Cryderman v. State, 101 Neb. 85, 161 N. W. 1045. In Dinsmore v. State, *supra*, we held that although a jury had the right to fix the penalty in cases of this character, it had no right to be actuated by considerations of mercy but should be guided alone by the evidence, the facts, and the circumstances disclosed by the record, under the instructions of the court, and that if the evidence revealed a case in which the death penalty should be fixed, the jury had no right to be deterred from discharging its sworn duty through sympathy for the accused. The same rule applies to this court in determining the issue now before us. Accordingly we must put aside appeals to sympathy or mercy.

This brings us to defendant's second proposition for the reduction of the sentence.

In Anderson v. State, *supra*, we held that the statute made it the duty of this court, when the proper proceedings were had, to review the evidence and prevent the imposition of punishment which the evidence would not warrant, and that we were empowered to reduce the sentence and render such a one as was justified by the evidence. In subsequent cases we have applied the act and in several cases have reduced the sentence.

We have examined all cases called to our attention by counsel and others found by our own research. In all of them we have found a substantial reason, warranted by the evidence, to cause either an affirmance or re-

duction of the sentence. We recognized in Rogers v. State, 141 Neb. 6, 2 N. W. 2d 529, that precedents were of little value in determining a question such as we have here, and yet our decisions show an effort to sustain a consistent application of the act. The proper administration of justice according to law requires it. However, we have recognized that the answer rests upon the facts and circumstances in each case. In Charles v. State, 27 Neb. 881, 44 N. W. 39, a burglary case, we held that it was never intended to impose the full penalty of the law unless a case of great atrocity was shown. However, in Peterson v. State, 115 Neb. 302, 212 N. W. 610, a robbery case, we held that we will not often reduce the sentence of the trial court where the crime involved great moral turpitude and was one of violence. See, also, Jackson v. State, 133 Neb. 786, 277 N. W. 92; Pauli v. State, 151 Neb. 385, 37 N. W. 2d 717.

In Simmons v. State, *supra,* without reference to the statute we held that it was our duty to administer the law as it exists and "Where a defendant, after a fair trial, has been convicted of murder in the first degree and the jury, by its verdict, has imposed the death penalty, and the court has passed sentence in conformity with the verdict, this court will not interfere with such sentence on the ground that it is excessive, in the absence of any mitigating circumstances."

In Wesley v. State, 112 Neb. 360, 199 N. W. 719, we held that there was nothing to urge in extenuation of the act "* * * and whatever repugnance the individual may feel toward capital punishment must be put aside in obedience to the law of the state and in deference to the verdict of the jury."

Defendant's counsel argues here that the only explanation of his act is that he went violently insane, had no conception of what he was doing, and, even if not insane, his mind was not a reliable regulator of his conduct. He relies here specifically upon three of our decisions.

In Hamblin v. State, 81 Neb. 148, 115 N. W. 850, we held that there "may be grave doubts as to his responsibility for his acts at the time of the tragedy," and there was no justification for taking the defendant's life. The penalty of death was changed to life imprisonment.

In Muzik v. State, 99 Neb. 496, 156 N. W. 1056, we found that while the evidence showed that defendant understood and comprehended the nature of the deed he committed and the difference between right and wrong "his mind was nevertheless abnormal." Following Hamblin v. State, *supra,* the sentence of death was reduced to life imprisonment.

In Cryderman v. State, *supra,* a death sentence was reduced to life imprisonment where the evidence showed that defendant understood the nature of his act and the difference between right and wrong, but that his mind was not normal and was not entirely reliable as a regulator of his conduct.

However, in subsequent cases we have dealt with evidence of insanity and abnormality in considering the question here presented and arrived at a different result. In Carter v. State, 115 Neb. 320, 212 N. W. 614, an expert witness for defendant there described the mind of the defendant in considerable similarity to the testimony of defendant's expert witness here, and expressed it as his opinion that he did not know the difference between right and wrong with respect to the act charged. As we read this record, defendant's expert witness did not go that far in his testimony in this case. There is no similarity in the facts of the killings in the two cases. We there held: "If reliance is to be placed upon the verdict of the jury as to the insanity of the defendant, his crime was deliberately planned and executed in cold blood. If the extreme penalty is justified at all, it would seem that the facts before us are amply sufficient to call for the exercise of such penalty."

In Sherman v. State, 118 Neb. 84, 223 N. W. 645, we

were petitioned to and refused to set aside a death penalty. There the motive was in part that of sex desires. There insanity was presented. There we found that there was nothing strange or queer in the defendant's personal history that would condone his act and no circumstance in his life to impeach his sanity and refused to set aside the sentence of death.

MacAvoy v. State, 144 Neb. 827, 15 N. W. 2d 45, was the last case involving this question to be determined here. There expert testimony was that defendant was abnormal and at the time of the crime unable to distinguish between right and wrong. There was expert evidence to the contrary. The jury resolved that question. We there said we thought the defendant abnormal when he committed the crime and "The legislature, in drafting and enacting our homicide law and in providing the penalties for its violation, must have felt that crimes would be committed by such abnormal persons as would warrant the infliction of the death penalty. The test is whether defendant had sufficient mental ability to distinguish between right and wrong in respect to the particular things he did in causing the death of this girl. The jury found that he was responsible for his acts. We think the evidence shows that the jury were entirely correct in so finding. The crime here committed is so gruesome and depraved in character that a reduction of the sentence prescribed by the jury and imposed by the trial court would amount to a holding that capital punishment will never be enforced in this state, irrespective of the legislative enactments on the subject. We can find no justifiable reason for substituting our judgment for that of the jury and the trial court in prescribing and assessing a penalty which the law authorizes in such cases."

These cases demonstrate that a defendant's mental abnormality is to be considered, but is not necessarily a controlling factor in the decision of this question.

The facts of the crime, the motive, and the defense of

abnormality in the MacAvoy case are quite similar to those of the instant case.

Defendant here urges differences between the MacAvoy case and the instant case. In the MacAvoy case there was evidence indicating that the defendant returned to the scene of the crime on the night following, found his victim alive, and then killed her, and that that placed MacAvoy beyond consideration of clemency. In the instant case defendant stated in both his confessions that he did not know that deceased was dead when he covered her body with weeds. He left her there. The next day he resumed normal activities and contacts. He did not go back or seek to find out if death had come or life could be saved to deceased. Defendant points out that there is a difference in the prior lives of the two men, in their family background, and in their evidence as to mental condition. To the extent that those differences exist, we do not deem them controlling.

The Legislature has fixed the public policy of this state and determined what shall be done in cases of this character. It is a policy of long standing. It is a trite statement, but it is our duty to enforce the law. As in the MacAvoy case so here we find no justifiable reason for changing the judgment of the jury in fixing the death penalty. The judgment of the jury is warranted by the evidence. The sentence of death is affirmed.

We have hereinbefore found that there was no prejudicial error in the trial of this case. The judgment of the district court is in all respects affirmed.

Friday, the 26th day of October 1951, between the hours of six a. m. and six p. m. of said day, is fixed as the date for carrying into effect the sentence of the district court.

AFFIRMED.