STATE OF NEBRASKA, APPELLEE, V. JAMES T. HALL, ALSO KNOWN AS THOMAS DUANE STRAWDER, APPELLANT.

492 N.W.2d 884

Filed December 18, 1992.   No. S-91-919.

Jerry J. Fogarty, Deputy Hall County Public Defender, for appellant.

Don Stenberg, Attorney General, and Donald A. Kohtz for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

FAHRNBRUCH, J.

Complaining that his sentences are excessive, James T. Hall, also known as Thomas Duane Strawder, appeals his sentence of life imprisonment for second degree murder and his consecutive sentence of 20 years' imprisonment for use of a weapon to commit a felony.

George D. "Joe" Allan died January 2, 1991, as a result of Hall's firing five .357-Magnum revolver shots into Allan's body. Three of the shots were inflicted upon Allan after he was knocked to the ground by two earlier shots. A sixth shot missed him.

We affirm the sentences imposed by the district court for Hall County following Hall's guilty pleas, which were entered pursuant to a plea agreement with the prosecutor.

Allan was killed while he was inspecting animal traps he and his 5-year-old son had placed on his property near the Platte River in Hall County the previous day. His 5-year-old son had accompanied Allan in his pickup truck as he inspected the traps on the day he was killed. When Allan arrived at the site of the killing, Hall, armed with a gun and ammunition he had stolen during the burglary of the 3-D "ammunition factory" in Doniphan, was attempting to conceal a car he had stolen in Grand Island. Hall found the gun partially disassembled in a vise when he burglarized the 3-D building. He reassembled the gun and took it and more than 200 rounds of ammunition for it. The record reflects that Hall planned to commit an armed robbery on the evening of January 2 and use the car he had

stolen as a getaway vehicle. Hall told the district court judge that he burglarized the ammunition factory to obtain money "to take care of my needs and my insecurities." He told the probation officer that upon finding the .357-Magnum revolver, his plans changed. After Hall found the gun and ammunition for it, "I was going to go and kill my father and kill my stepfather and I didn't care what happened to me," he told the judge. Before confronting Allan, Hall had also burglarized a four-bedroom cabin trailer on Allan's property and taken clothing and other items.

Hall told the court that as he was covering the stolen car with tree branches, Allan happened on the scene. Hall said he hid among some trees and watched Allan inspecting the stolen car and its license plate. Hall said he was afraid that Allan would remove the keys from the stolen vehicle and that Hall "could not outrun pursuit." When Hall stepped from his hiding place, Allan asked him if the car was his. Hall said he told Allan that the car was his. Hall claimed that when Allan made a move with his right hand, Hall "came around with the gun [he had stolen], pointed it at [Allan] and pulled the trigger." Hall shot Allan five times. Allan's young son, who had remained in the pickup truck, was an eyewitness to his father's killing. He said his dad fell to the ground after Hall had shot him twice, leaving the inference that Hall had shot Allan three times while he was lying on the ground. A sixth shot by Hall missed Allan. Hall maintains that he kept shooting because Allan kept trying to draw his own handgun from its holster.

Hall attempted to reload his stolen weapon, but it would not open for the reload. Hall claimed he was unaware of the boy's presence in Allan's pickup until he approached the truck to make his escape from the scene. Hall pointed his empty gun at the boy, ordered him out of the truck, and then fled the scene in Allan's truck. The child was left alone with the body of his father, 2 miles from the nearest house. The boy went to a farmhouse. Authorities were notified that Allan had been shot.

Hall was taken into custody in Cimarron, Kansas, by the Gray County sheriff the day after Allan was killed. Hall abandoned Allan's pickup truck in Kansas. He stole another pickup in Gray County. While in custody for auto theft in Gray

County, Hall confessed to killing Allan and taking his truck. Hall also told law enforcement officials that he planned to go to Texas and "maybe across into Mexico and living [sic] off the land."

Hall was initially charged with first degree murder, use of a weapon to commit a felony, child abuse, being a felon in possession of a firearm, and two counts each of theft by unlawful taking and burglary. At his arraignment on the eight-count information, Hall stood mute. The district judge entered pleas of not guilty to each count for Hall.

A plea agreement was reached between Hall and the prosecutor. At a July 16, 1991, hearing, Hall pled guilty to second degree murder and use of a weapon to commit a felony. The remaining charges were dismissed in accordance with the plea agreement. On September 5, Hall was sentenced to life imprisonment on the second degree murder charge and 20 years' imprisonment on the weapons charge, the sentences to run consecutively. Second degree murder is a Class IB felony under Neb. Rev. Stat. § 28-304(2) (Reissue 1989), for which the maximum penalty is life imprisonment, see Neb. Rev. Stat. § 28-105(1) (Reissue 1989). The maximum sentence on the use of a weapon to commit a felony is 20 years' imprisonment, a $25,000 fine, or both, and must be imposed consecutively to the felony sentence. See, Neb. Rev. Stat. § 28-1205 (Reissue 1989); § 28-105.

Except under certain circumstances when the Supreme Court is reviewing a sentence of death, *State v. Reeves*, 239 Neb. 419, 476 N.W.2d 829 (1991), it is not the function of an appellate court to conduct a de novo review of the record to determine whether a sentence is appropriate. We have long adhered to the doctrine that to the district court and not to an appellate court is entrusted the power to impose sentences for the commission of crimes against the State; and the judgments of that court cannot be controlled or interfered with in the absence of an abuse of discretion. See *Wright v. State*, 45 Neb. 44, 63 N.W. 147 (1895). We have also declared that "[a] sentence imposed within the statutory limits will not be disturbed on appeal in the absence of an abuse of discretion by the trial court." *State v. Coleman*, 241 Neb. 731, 733, 490 N.W.2d 222, 226 (1992). This standard has

been in effect since at least 1950, when we held in *Carr v. State*, 152 Neb. 248, 254, 40 N.W.2d 677, 681 (1950), that " '[w]here the punishment of an offense created by statute is left to the discretion of a court, to be exercised within certain prescribed limits, a sentence imposed within such limits will not be disturbed unless there appears to be an abuse of such discretion.' " See, also, *State v. Start*, 239 Neb. 571, 477 N.W.2d 20 (1991); *State v. Haynie*, 239 Neb. 478, 476 N.W.2d 905 (1991); *Kirkendall v. State*, 152 Neb. 691, 42 N.W.2d 374 (1950). All Nebraska courts acting in an appellate capacity are bound by the standard enunciated in *State v. Coleman, supra.*

Hall, 33 years of age at the time of Allan's murder, has a criminal record which includes auto theft as a juvenile, and convictions of grand theft and third degree sexual assault. The latter conviction stemmed from an incident involving Hall and a close relative. After considering Hall's age, mentality, education, experience, social background, past criminal record, and the amount of violence involved in the commission of his crimes, the district court found that "any prison sentence less than the maximum would depreciate the seriousness of the crimes."

Hall admitted to the court that he intentionally shot and killed Allan. The killing of Allan without just cause was a senseless and unnecessary act of violence. From the facts and circumstances of this case, a sentencing court could reasonably conclude that Hall killed Allan to avoid being apprehended for the several crimes he had committed. A sentencing court could also reasonably and properly conclude that any physical or mental health problem that Hall claimed he had was no justification to take Allan's life, nor that any such claimed problem should serve to mitigate the sentences Hall received.

Hall related that after he obtained the gun in the 3-D burglary, he wanted to kill his father and stepfather if he could find them. He said he wanted them dead. It was indeed fortunate that the gun Hall had stolen in the 3-D burglary would not open for a reload after he had fired all of its shots at Allan. Hall's state of mind to avoid being apprehended may be drawn from the fact that he pointed the gun he had stolen at the victim's 5-year-old son, ordered him out of the truck, and left

the boy alone with his dead father in a remote area 2 miles from the nearest house. Hall then began his trek to Kansas and anticipated traveling to Texas and perhaps to Mexico.

Had Hall been convicted of all eight of the charges originally brought against him, and had he been given the maximum sentence on each count, Hall faced, in addition to the death penalty, 110 years' imprisonment for five Class III felonies and two Class IV felonies.

Hall's sentence was within the statutory limits of crimes to which he pled guilty. The trial court's reasons and rulings in sentencing Hall were not clearly untenable, nor did they unfairly deprive Hall of a substantial right and a just result. See *State v. Coleman, supra.* For these reasons, it cannot be said that the trial court abused its discretion in sentencing Hall. The sentences imposed by the district court are affirmed.

AFFIRMED.