STATE OF NEBRASKA, APPELLEE, V. FRANK TLAMKA, APPELLANT.
511 N.W.2d 135

Filed March 30, 1993.   No. A-91-664.

Bradley J. Montag, of Moyer, Moyer, Egley, Fullner & Warnemunde, for appellant.

Don Stenberg, Attorney General, and Delores Coe-Barbee for appellee.

SIEVERS, Chief Judge, and CONNOLLY and WRIGHT, Judges.

SIEVERS, Chief Judge.

Frank Tlamka appeals his conviction in the district court for Lancaster County of first degree sexual assault on a child, a Class II felony. We examine the important issue of the admissibility of a child victim's statement to a police officer, as well as psychological testimony designed to bolster the defendant's denial of guilt.

## FACTUAL BACKGROUND

The information filed against Tlamka charged that on July 22, 1990, he subjected J.H., then not quite 5 years old, to sexual penetration in Lancaster County. At the time of the offense, Tlamka was 61 years of age and had maintained a long-term relationship, including part-time residence, with the victim's grandmother Arlene. On July 22, Tlamka and Arlene came to Lincoln to the victim's home. Arlene and J.H.'s mother went shopping, J.H.'s father was at work, and Tlamka stayed with J.H. and her 1-year-old sister to babysit.

The evidence establishes that Tlamka had a good relationship with Arlene's sons. Tlamka also had an extremely close relationship with J.H., and witnesses described them as inseparable. Tlamka apparently regarded J.H. as he would a

natural granddaughter, and she referred to him as "Po-po."

After the shopping trip and after J.H.'s father returned home from work, Tlamka had a conversation with the father in which Tlamka indicated that the parents should keep their bedroom door shut at night "when [they] were making love because [J.H.] is starting to talk about what [they] were doing in there." Tlamka further told the father that J.H. had told him, " 'I saw mommy putting daddy's weiner in her mouth . . . .' " After Tlamka and Arlene left J.H.'s residence, her father told her mother about Tlamka's warning, and the father testified that J.H. unexpectedly came "around the corner and she told me, 'I saw Po-po's weiner.' " When briefly questioned by her parents, J.H. indicated that it had been placed in her mouth by pointing to her mouth with her finger.

J.H.'s mother testified that on the following day J.H. approached her with a naked "Ken doll" and said, " 'This is what Po-po looked like when you were shopping, mama.' " At this point, the parents decided to seek the assistance of their pastor, which resulted in the police being called. J.H. was interviewed at her home on July 25 at approximately 7 p.m. Sgt. Mark Lantis of the Lincoln Police Department used anatomically illustrative dolls in the interview and asked J.H. to show him what had happened, imagining that the male doll was Tlamka. J.H. related that Tlamka had taken her clothes off. When asked if Tlamka kept his clothes on, she replied, " 'No.' " In response to Lantis' question, she undressed the male doll, with the exception of the underwear. When asked again if that was how Tlamka was dressed, she hesitated and then said, " 'No.' " When asked to show Lantis, she pulled the underwear down so that the penis on the doll was exposed. Lantis described her as hesitant at that point to use the dolls, so he asked her to show the rest of what happened by using the male doll and herself. J.H. placed the male doll between her legs, rubbing the penis against her vaginal area and then against her stomach and her nipples. She then turned over, laid on her stomach, and rubbed the male doll against her buttocks area.

Lantis asked J.H. questions in addition to having her use the dolls. The effect of that questioning was that J.H. said that there had been vaginal penetration, but not anal penetration,

and that Tlamka had placed his penis in her mouth. Lantis further inquired as to whether this had happened anyplace other than Lincoln, and J.H. responded in the affirmative. When asked how many times, J.H. held up two fingers and told Lantis that the other time had happened " '[w]hen we stayed at grandma's.' "

A medical examination of J.H. was performed on July 26 by Dr. Kristin Johnson, after she took a history from J.H. J.H. reported the same acts by Tlamka as she had reported to Lantis. The physical examination showed that J.H.'s genital area was normal for a female of her age and that her hymen was intact and measured 3 mm, which was normal for a child of her age. Dr. Johnson testified at trial that she found no physical evidence whatsoever of sexual assault or abuse.

By way of defense, Tlamka denied ever having any inappropriate sexual contact with J.H. He testified that on July 22, J.H. had wanted him to lie down with her at nap time and that he had lain down on a rug beside her bed. She got out of bed, sat next to him, and, according to Tlamka, brushed her hand across his groin area and then "made a kissing sound." Tlamka expressed surprise and asked her what she was doing, at which time J.H. said that she had seen her parents do such things. Tlamka stated he had explained to J.H. that her parents did those things because they were married. That was the end of the conversation, except that he later informed J.H.'s father that he and J.H.'s mother should close the bedroom door, as J.H. was talking about what her parents were doing.

Tlamka also introduced the testimony of Dr. Rodney Taylor, a urologic surgeon from Omaha. Dr. Taylor testified that he had obtained a history from Tlamka of being unable to achieve an erection for approximately 10 years. He also related a history of peripheral vascular disease, including surgery in 1979 consisting of a bilateral sympathectomy. Dr. Taylor performed a nocturnal penile tumescent study in a sleep laboratory to monitor Tlamka and to determine whether he could achieve an erection while asleep. According to Dr. Taylor, the standard for such a dysfunction is nocturnal erection. Nocturnal erection testing is used because it differentiates between organic impotence, based on such things as inadequate blood supply or

impaired nerves, and psychogenic impotence, where due to stress or other factors the individual is unable to achieve an adequate erection while awake and alert, but will obtain adequate erections during sleep.

Dr. Taylor testified that a man of Tlamka's age with a normal neurovascular supply intact would be expected to obtain four to six adequate erections each night during sleep, adequate being described as sufficient for vaginal penetration. Based on the two-night study, it was found that Tlamka had one partial erection one night and no erectile function at all the other night. Dr. Taylor's opinion was that Tlamka had organic erectile dysfunction, which in his opinion is common in men who have peripheral vascular disease. According to Dr. Taylor, the individual cannot control the results of this test because he is asleep and the monitoring devices are designed to sound an alarm for the technician should they be dislodged or taken off. Dr. Taylor rendered the opinion that although his examination was conducted on January 22 and 23, 1991, he felt that Tlamka could not have achieved an erection adequate for vaginal penetration on July 22, 1990. He also testified that impotency does not directly affect sexual desire and that an impotent man can achieve ejaculation.

· In addition to the foregoing evidence, Tlamka offered the testimony of his family physician of 16 years, his parish priest of 17 years, and his banker of 7 years, all of whom testified that Tlamka was an honest man who was trustworthy and had integrity.

## ASSIGNMENTS OF ERROR

Tlamka assigns 11 errors; however, not all of them were discussed in his brief. We do not consider those assigned but not discussed. See *State v. Melton*, 239 Neb. 576, 477 N.W.2d 154 (1991). We have consolidated several of the remaining assignments into five assignments of error: (1) The trial court erred in refusing to allow the testimony of a clinical psychologist that Tlamka was a normal heterosexual male and, as such, had customary sexual appetites and would not be likely to commit sexual acts with a 4-year-old child; (2) the trial court erred in excluding the testimony from J.H.'s grandmother

Arlene that she had been sexually abused as a child; (3) the trial court erred in receiving evidence of what J.H. had stated to Lantis several days after the alleged assault as an "excited utterance" exception to the hearsay rule; (4) the trial court erred in not requiring that J.H.'s allegations be corroborated; and (5) the trial court erred in failing to admonish the jury at the end of its deliberations on April 16, 1991, as required by Neb. Rev. Stat. § 29-2022 (Reissue 1989). In addition, the sentence is alleged to be excessive.

## PSYCHOLOGICAL TESTIMONY

The State's pretrial motion in limine with respect to the testimony of Dr. Henry Balters, a clinical psychologist, was sustained. At trial, an offer of proof was made by question and answer of Dr. Balters. That offer established that Dr. Balters had done a psychological evaluation of Tlamka consisting of an interview, the administration of several psychological tests, and a review of records, apparently police reports of the incident. The psychological tests were the Shipley Institute of Living Scale, the Minnesota Multiphasic Personality Inventory (MMPI), the Mellon Clinical Multiaxial Inventory II (MCMI), and a Rotter's Incomplete Sentences Blank, adult form.

When asked his opinion "as to what personality profile Frank Tlamka would have," the doctor responded, "[H]e doesn't really fit any personality profiles, per se, that I'm used to seeing." The doctor was asked if he characterized Tlamka "as a normal heterosexual," and the doctor answered affirmatively. Dr. Balters also testified that a normal heterosexual was unlikely to commit sexual acts with a 4-year-old child. The doctor stated that it was his professional opinion that Tlamka "seems to be someone who doesn't have that many psychological problems, that he seems to have customary sexual appetites that would coincide with an individual his age." On cross-examination, Dr. Balters admitted that the personality tests were general personality tests given to everybody who comes in for "some sort of personality disorder evaluation." The trial court upheld the objection by the State and ruled the testimony inadmissible. Tlamka argues that Dr. Balters' testimony was relevant evidence of a character trait,

which is admissible when offered by the accused under Neb. Evid. R. 404, Neb. Rev. Stat. § 27-404 (Reissue 1989).

Although Dr. Balters testified that the personality tests were generally accepted in the psychological community for performing psychological evaluations, he also acknowledged that they are not structured solely to evaluate people regarding deviate sexual behavior.

Neb. Evid. R. 702, Neb. Rev. Stat. § 27-702 (Reissue 1989), provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Also pertinent here is Neb. Evid. R. 401, Neb. Rev. Stat. § 27-401 (Reissue 1989), "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Also involved is Neb. Evid. R. 402, Neb. Rev. Stat. § 27-402 (Reissue 1989), which provides in part that "[e]vidence which is not relevant is not admissible." Finally, Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 1989), in essence provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury.

*State v. Reynolds*, 235 Neb. 662, 457 N.W.2d 405 (1990), held that under the Nebraska Evidence Rules there are four preliminary and interrelated questions in determining whether an expert's testimony is admissible:

> (1) Does the witness qualify as an expert pursuant to Neb. Evid. R. 702? (2) Is the expert's testimony relevant? (3) Will the expert's testimony assist the trier of fact to understand the evidence or determine a controverted factual issue? (4) Should the expert's testimony, even though relevant and admissible, be excluded in light of Neb. Evid. R. 403?

*Reynolds*, 235 Neb. at 679-80, 457 N.W.2d at 417.

*Reynolds* also makes it clear that the Nebraska Supreme

Court has recognized and adopted the test from *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), where a "lie detector" test was ruled inadmissible. As delineated in *Reynolds*, the *Frye* test is as follows: "[R]eliability for admissibility of an expert's testimony, including an opinion, which is based on a scientific principle or is based on a technique or process which utilizes or applies a scientific principle, depends on general acceptance of the principle, technique, or process in the relevant scientific community." *Reynolds*, 235 Neb. at 681-82, 457 N.W.2d at 418.

*Reynolds* holds that if an expert's testimony lacks probative value, it is irrelevant and, therefore, inadmissible. As said in *Reynolds*, it is axiomatic that irrelevant evidence will not assist the trier of fact. In our view, the *Frye* test, as set forth in *Reynolds*, addresses the probative value of the evidence and, thus, the relevancy of the expert's testimony, as well as whether the evidence will assist the trier of fact. Recently, the Nebraska Supreme Court reaffirmed the *Frye* test as one of the criteria that a trial court determines must be satisfied before novel expert testimony is admitted. See *State v. Houser*, 241 Neb. 525, 490 N.W.2d 168 (1992).

We believe the import of Dr. Balters' testimony is fairly characterized as follows: (1) Generally accepted personality tests were administered; (2) as a result of those tests and his interview, Dr. Balters would characterize Tlamka as a normal heterosexual; and (3) a normal heterosexual is not likely to commit sexual acts with a 4-year-old child.

There are a number of cases, often concerning sexual assaults, where a defendant has sought to bolster his denial of the act by psychological evidence. This evidence takes several forms, for example, (1) the defendant's psychological profile determined upon standardized testing is inconsistent with the profile of known abusers or (2) a person with the defendant's psychological profile would not commit such acts. The leading case for the admission of such psychological testing appears to be *People v. Stoll*, 49 Cal. 3d 1136, 783 P.2d 698, 265 Cal. Rptr. 111 (1989), where the proffered testimony was that the defendants, who were charged with committing lewd and lascivious acts upon children, displayed no signs of deviance or abnormality. The psychologist, Dr. Roger Mitchell, would have

testified that the defendant Grafton had normal personality function, that Grafton had not engaged in sexual deviancy in the past, and that it was unlikely that "she would be involved in the events she's been charged with." (Emphasis omitted.) *Stoll*, 49 Cal. 3d at 1149, 783 P.2d at 705, 265 Cal. Rptr. at 118. Dr. Mitchell acknowledged that his opinion was based upon the MMPI and the MCMI, two of the same tests involved in the instant case, as well as many other pieces of data and, in many respects, his subjective judgments.

The California court found that the *Frye* test is not to be applied to expert opinion testimony "absent some special feature which effectively blindsides the jury" and that the methods employed in the analysis of the defendants were not new to either law or psychology. *Stoll*, 49 Cal. 3d at 1157, 783 P.2d at 710, 265 Cal. Rptr. at 124. Furthermore, the California court said that issues of test reliability and validity may be explored on cross-examination. Thus, the *Frye* test was held not to prevent the admissibility of the testimony. The California court held: "Expert opinion that defendants show no obvious psychological or sexual problem is circumstantial evidence which bears upon whether they committed sexual acts upon children, and is admissible 'character' evidence on their behalf." *Stoll*, 49 Cal. 3d at 1161, 783 P.2d at 714, 265 Cal. Rptr. at 127.

Two members of the California court dissented, and we include their view:

> I do not suggest the results of these tests are necessarily inadmissible. The purpose of *Kelly/Frye* is not to exclude evidence but to test its *reliability* by giving the members of the scientific community "the determinative voice" in deciding that issue. [Citations omitted.] There may well be a body of scientific research showing that the standardized measures of "personality function" are generally accepted by mental health experts as scientifically reliable tests of sexual deviancy or normality. On this record, however, such evidence is conspicuously absent.

*Stoll*, 49 Cal. 3d at 1168-69, 783 P.2d at 719, 265 Cal. Rptr. at 132.

The Iowa Supreme Court rejected the majority's view in *Stoll*

and held that similar testimony was inadmissible in *State v. Hulbert*, 481 N.W.2d 329 (Iowa 1992). In the Iowa case, the defendant sought to introduce the results of psychological testing showing that he was a normally functioning individual whose test results did not match the psychological pattern or profile for known sex abusers. In the offer of proof, the psychologist stated that he could find no similarities between the profiles of Hulbert and known child molesters.

The defendant's argument in *Hulbert* was that the proffered evidence would have assisted the jury's understanding of the traits of known molesters, thereby raising reasonable doubt as to his guilt. Further, Hulbert argued that the evidence was admissible as relevant evidence of good character, as well as of his nondisposition to commit the charged offenses.

In its analysis, the Iowa court initially placed heavy reliance on the trial court's discretion, but later found that the evidence would not assist the trier of fact to either understand the evidence or determine a fact in issue, observing that veracity (presumably of the defendant's denial of guilt) was not a " 'fact in issue.' " *Id.* at 332. The court also found that the evidence was more likely to convey a conclusion about the defendant's guilt rather than assist the jury. The court conceded that the defendant had a right to offer evidence of his own good character to prove that it was unlikely that he committed the crime, but noted that such character evidence is generally related by opinions formed of a defendant before the commission of an offense, whereas this type of character evidence is formed after the offense. The *Hulbert* court further observed that this was not ordinary character evidence because it came "cloaked with an aura of scientific reliability." *Id.* at 333. Saying that the "question boils down to whether the evidence would aid the jury in its decision-making role," the Iowa court ended where it began, deferring to the discretion of the trial court and finding no abuse of discretion in the rejection of the evidence. *Id.* (Uncertain about its significance, we nonetheless observe that the California Court of Appeal excluded the psychological evidence and was reversed, while the Iowa Court of Appeals admitted the evidence and was also reversed.) Other jurisdictions have considered the issue, but

none as completely as California and Iowa.

Turning to the record here, *Reynolds* provides strong guidance that the *Frye* test applies in this case. Accordingly, we reject the reasoning of the California court that *Frye*'s application is limited to "new scientific" procedures. The California court held that the reliability test of *Frye* need not be satisfied, as the MMPI and the MCMI have longstanding acceptance and use in the psychological community, according to the majority opinion in *Stoll*.

However, in our view, it is not the acceptance in the psychological community of the tests that Dr. Balters administered which must withstand the *Frye* standard of reliability. We acknowledge that Dr. Balters testified that the battery of tests administered are standard and accepted tests. Instead, we believe it is the use which Dr. Balters seeks to make of those tests which must have an evidential underpinning of acceptability in order to pass the *Frye* test of reliability for admission. Dr. Balters used those generally accepted tests in conjunction with his interview of Tlamka and his review of the police reports to conclude that Tlamka is a normal heterosexual not likely to commit sexual acts with a 4-year-old child. It is this reasoning or process which must meet the *Frye* test.

There is no evidential showing of the methodology for the tests or the interview or how the results of the tests were utilized to arrive at the conclusion which was sought to be introduced. Dr. Balters' description of Tlamka was that "he doesn't really fit any personality profiles, per se, that I'm used to seeing." However, there was no evidence of the personality profile, drawn from the same or similar tests given to Tlamka, of child abusers which is generally accepted as such in the psychological community. Nor was there a showing that Dr. Balters then compared such generally accepted personality profile with Tlamka's personality profile. There was no evidence in this record drawn from reliable and accepted studies or any other data which establishes that those who test as Tlamka did are in fact normal heterosexuals. Likewise, there was no evidence that one classified as a normal heterosexual does not, cannot, or will not sexually abuse a child, either on one occasion or repeatedly. In summary, the methodology used by Dr. Balters to arrive at

his opinion does not have the evidential underpinning of acceptance in the relevant scientific community for us to conclude that it passes the *Frye* test of reliability.

If the psychological community believes and accepts that Dr. Balters' methodology can reliably assess who has or who has not engaged in prior acts of child sexual abuse, this record is conspicuously without any such testimony or evidence. In the words of the dissent in *Stoll*, it is the relevant scientific community which has the "determinative voice" in establishing reliability. Here, even Dr. Balters himself did not give "voice" to how and why his methodology works and, thus, why it should be considered reliable by this or any other court. Accordingly, without this necessary evidential foundation, the trial court was correct in refusing to admit the opinion from Dr. Balters, as it did not have probative value and was, therefore, irrelevant. Additionally, without probative value, it naturally follows that the testimony would not have assisted the jury.

In *State v. Houser*, 241 Neb. 525, 490 N.W.2d 168 (1992), a murder conviction was reversed due to the improper admission of a DNA profile test. The Supreme Court said that the trial court must be satisfied as to (1) the general acceptance of DNA theories in the scientific community and (2) the acceptance and validity of the methodology of testing DNA which was used. In *Houser*, the evidence of the protocol used by the scientists was found wanting. We believe the same defect exists here. Although the psychological tests administered to Tlamka may have general acceptance, there was no evidence upon which to judge the acceptance and reliability of the protocol or methodology used to reach the opinion from the tests. The objection to Dr. Balters' testimony was properly sustained.

### ALLEGED HISTORY OF FAMILIAL SEXUAL ABUSE

Tlamka sought to introduce evidence from Arlene, J.H.'s grandmother, that Arlene had been sexually abused by an uncle's touching of her when she was 6 years old. The court sustained the State's objection on the grounds of relevancy. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be

without the evidence." Neb. Evid. R. 401. Tlamka's argument is that such evidence raises the possibility that someone other than Tlamka abused J.H. How one makes the intellectual journey from what may have happened to the grandmother many years ago at the hands of someone else to what happened to J.H. is not explained or supported by citation of authority. The fact in issue was whether Tlamka sexually assaulted J.H., and what someone else may have done to her grandmother many years earlier is a good example of irrelevancy. The assignment of error is without merit.

## EXCITED UTTERANCE FROM VICTIM

The State offered the testimony of Sergeant Lantis of the Lincoln Police Department that he had interviewed J.H. on the evening of July 25, 1990, using anatomically illustrative dolls. The interview, through J.H.'s acting out with the male doll, as well as the questions and answers, provided evidence that Tlamka had undressed J.H., had placed his penis in her mouth and vagina, and had rubbed her stomach, nipples, and buttocks with his penis. In response to his questions, J.H. told Lantis that she knew Tlamka had placed "it" inside her " '[b]ecause it hurt,' " that Tlamka had " 'put Vaseline on my pee-pee,' " and that this had happened twice: " 'when we stayed at grandma's' " and " '[w]hen Po-po was babysitting with us while mom, dad and grandma went shopping at Sears.' " The trial court overruled the defense's hearsay objection on the ground that the statement to Lantis was an excited utterance. The State did not elicit any preliminary testimony about the child's demeanor while she was with Lantis. The only such evidence came from the cross-examination of Lantis, which we reproduce in part:

Q. And during the time of your interview was she behaving as you'd expect a normal four-year-old girl to behave?

A. Yes.

Q. Didn't seem to be distraught or anything about anything in particular?

A. She was somewhat shy, and several questions when I'd ask her she'd look at her parents who were standing in the doorway, as if to get their okay to answer me. Usually

one of them would say, "It's okay," and then she would answer a question.

Q. But I guess shyness would be a typical trait you'd expect to find in a four-year-old girl?

A. Yes. I would say she was probably overly shy when I first got there, however, I guess after I'd been with her for a while she was real — real easygoing and was able to talk to me and seemed real comfortable with me.

Q. [J.H.] did not make the complaint to — make a complaint of what happened, to you. Your information was a result of your interrogation of her, isn't that correct?

A. That's correct.

The alleged error in the admission of this testimony is that it was hearsay and did not fall under the excited utterance exception to the hearsay rule. The decision of the Nebraska Supreme Court from which we principally seek guidance is *State v. Plant*, 236 Neb. 317, 461 N.W.2d 253 (1990). However, we initially observe a substantial difference in *Plant*, where the evidence was offered not only as an excited utterance, but under the two residual exceptions to the hearsay rule as well. Before attempting to articulate how *Plant* impacts our decision here, we observe that the court in *Plant* found that the admission of the statement of the child witness was not an abuse of discretion.

Since *Plant*, the court has decided *State v. Messersmith*, 238 Neb. 924, 936, 473 N.W.2d 83, 92 (1991), which held that the "admissibility of evidence is controlled by the Nebraska Evidence Rules, not judicial discretion, except in those instances under the Nebraska Evidence Rules when judicial discretion is a factor involved in admissibility of evidence . . . ." Neb. Evid. R. 803, Neb. Rev. Stat. § 27-803 (Reissue 1989), provides the exceptions to the hearsay rule and, in our view, is not discretionary except to the extent that Neb. Evid. R. 403 (probative value substantially outweighed by danger of unfair prejudice, etc.) is a factor in determining the admissibility. In the instant case, Neb. Evid. R. 403 is not involved, and therefore, judicial discretion is not a factor in the admissibility of this evidence.

In *Plant*, the out-of-court statement of Cindy Plant, the

4-year-old daughter of the defendant, indicated that her father had killed his 18-month-old stepson, Christopher Bartlett, by throwing him across the room. The statement was given to a police officer, Sgt. William Muldoon, 2 days after the fatal injury to Christopher. Cindy did not testify at trial, whereas in this case, J.H. did testify. The court set forth the three basic qualifications for an excited utterance: "(1) There must have been a startling event; (2) the statement must relate to the event; and (3) the statement must have been made by the declarant while under the stress of the event." *Plant*, 236 Neb. at 328, 461 N.W.2d at 263-64. The first two conditions are clearly satisfied in this case, and thus, we focus on the third qualification, as was done in *Plant*.

The courts have relaxed the requirement that a purported excited utterance be both contemporaneous to the event and spontaneously made, see, *State v. Red Feather*, 205 Neb. 734, 289 N.W.2d 768 (1980), and *In re Interest of R.A. and V.A.*, 225 Neb. 157, 403 N.W.2d 357 (1987), respectively. Instead, the Supreme Court in *Plant* initially said that the "key requirement is that the statement be made without time for conscious reflection." *Plant*, 236 Neb. at 329, 461 N.W.2d at 264. Having said that, the court made it clear that "time lapse is not dispositive." *Id*. Our view of *Plant*, therefore, is that the amount of time which elapses is not nearly as important as what may occur during the lapse of time.

We believe that our interpretation of *Plant* is supported by the Supreme Court's reliance upon a Colorado case which stated that " '[t]he element of trustworthiness underscoring the excited utterance exception, particularly in the case of young children, finds its source primarily in the "lack of capacity to fabricate rather than the lack of time to fabricate." ' " *Id*. (quoting *People in Interest of O.E.P.*, 654 P.2d 312 (Colo. 1982)). The court in *Plant* found that the fact that Muldoon had questioned Cindy did not per se destroy the character of her statement as an excited utterance. Furthermore, a showing of visible excitement on the part of the child at the time of the statement was not necessary. However, the declarant's nervous state is relevant as to whether the child's statement is made while under the stress of the event. Although the court's recitation of

evidence about the child declarant's behavior and demeanor in *Plant* shows more evident stress than J.H. exhibited with Lantis, we believe that the interviewing technique of using anatomically illustrative dolls makes a substantial difference in what is observable by the officer in the statement-taking process. This court discussed the use of such dolls extensively in *State v. Jury*, 1 NCA 1504 (1992).

The use of anatomically illustrative dolls is designed to enable the child to demonstrate what occurred and to make the recounting less traumatic. The *Plant* court said that a 4-year-old child is hardly adept at the type of "conscious reflection" necessary to fabricate a story of infanticide, citing with approval the conclusion of *People in Interest of O.E.P., supra*, that a 3-year-old child lacks the "reasoned reflection" to concoct a story of sexual abuse implicating her own mother. *State v. Plant*, 236 Neb. 317, 330, 461 N.W.2d 253, 265 (1990). The terms "reasoned reflection" and "conscious reflection" connote a cognitive process whereby the child consciously applies his or her powers of reason in order to create a description of an event which did not occur. It further suggests that the child aims the accusation at a specific person, in this case at Tlamka, a person who by all accounts had loved and nurtured J.H. as he would a natural granddaughter and to whom J.H. had responded in kind. We believe it extremely unlikely that a 4-year-old child such as J.H. is capable of reasoned reflection to create out of thin air the accusation against Tlamka which she, with remarkable consistency, related to her parents, Lantis, the examining doctor, and a jury of 12 adults.

In assessing the issue of conscious reflection, we observe that the sexual activity described by J.H. and depicted with the dolls is clearly adult in nature and scope. We believe it highly unlikely that such acts would be in the fund of information of a 4-year-old child so as to enable her to graphically describe and reenact those acts as a conscious fabrication against Tlamka.

Accordingly, we believe that the focus of inquiry in examining a child's out-of-court statements, including those made via anatomically illustrative dolls, is not lapse of time or whether leading interrogation questions were used, although

those are relevant considerations. More important is whether the surrounding facts and circumstances demonstrate an absence of the capacity to fabricate. This necessarily requires an examination of the statement's contents and whether it is likely to be the product of fabrication by the child. Here, J.H.'s parents testified that it would have been impossible for her to have observed them engaging in sexual activity. We recognize that Tlamka testified that J.H. told him she had seen her parents engaged in sexual activity, which she mimicked to him on July 22, 1990. However, we believe that Tlamka's testimony goes only to the weight and credibility of J.H.'s statement as told to Lantis, as well as to the weight and credibility of J.H.'s direct testimony. J.H. did in fact testify and relate to the jury the same events that she had acted out for Lantis with the dolls.

By focusing on whether there is a capacity to fabricate, we believe we are following the evolution of the excited utterance exception to the hearsay rule as it relates to child sexual abuse cases. The question is really one of reliability and trustworthiness of what the child declarant tells a parent, a social worker, a doctor, a police officer, or some other authority figure, followed by that person's subsequent telling of the story to the jury. When a child's out-of-court statement concerning sexual assault is offered under the excited utterance exception, the inquiry must necessarily include lapse of time, manner of questioning, whether the statement is all verbal or includes reenactment with dolls, whether the child possesses knowledge sufficient for fabrication, and whether the account is the result of suggestion. While these considerations are not exhaustive, they illustrate that the out-of-court statements of a child sexual assault victim should not be excluded based on any one factor. The recognition that there are circumstances in the course of human experience which by their very nature import reliability and trustworthiness has been the thread of admissibility common to all hearsay exceptions. Reliability and trustworthiness should likewise be the focus of inquiry for admissibility of a child's out-of-court statement concerning a sexual assault.

Our reading of *Plant* and other Nebraska Supreme Court decisions which we have cited is that when the requirements of

spontaneity and contemporaneousness for the excited utterance rule are relaxed for child victims/witnesses, they are replaced by a test of time *and* capacity for fabrication, which necessarily involves an assessment of reliability.

We believe that this record strongly shows a lack of capacity for fabrication of the events which J.H. graphically detailed and depicted with the dolls, despite the 3-day lapse between assault and statement. Accordingly, we believe that what J.H. related to Lantis is admissible as an excited utterance, as that exception has evolved in the context of child sexual abuse cases. Therefore, Tlamka's assignment of error on this issue is without merit.

## CORROBORATION

Tlamka assigns error in the failure of the trial court to require corroboration and to instruct on the need for corroborating evidence. The Nebraska Legislature has enacted ·Neb. Rev. Stat. § 29-2028 (Reissue 1989), which provides: "The testimony of a person who is a victim of a sexual assault as defined in sections 28-319 to 28-320.01 shall not require corroboration."

Tlamka was charged and convicted under Neb. Rev. Stat. § 28-319 (Reissue 1989), and therefore, corroboration was clearly not required. The case cited by Tlamka, *State v. Narcisse*, 231 Neb. 805, 438 N.W.2d 743 (1989), involved a trial occurring before the repeal of the statute requiring corroboration (Neb. Rev. Stat. § 29-2013 (Reissue 1985)) and the enactment of § 29-2028. Thus, the assignment of error is without merit.

## ADMONITION TO THE JURY

Tlamka assigns as error the trial court's failure to admonish the jury pursuant to § 29-2022 at the end of the deliberations on April 16, 1991. The statute provides in pertinent part:

> If the jury are permitted to separate during the trial, they shall be admonished by the court that it is their duty not to converse with or suffer themselves to be addressed by any other person on the subject of the trial, nor to listen to any conversation on the subject; and it is their duty not to form or express an opinion thereon until the cause is

finally submitted to them.

The jury was admonished several times during the trial, using the statutory language, although the trial judge wisely substituted the word "let" for "suffer." As said in *Sundahl v. State*, 154 Neb. 550, 562, 48 N.W.2d 689, 698 (1951), "It is not the number of admonitions but the fact of admonition that is important." Furthermore, the time at which Tlamka complains of no admonition is after the case had already been submitted to the jury. This assignment of error is without merit.

## EXCESSIVE SENTENCE

Tlamka was sentenced to a term of not less than 2 years nor more than 5 years, the trial court saying that any sentence short of imprisonment would depreciate the seriousness of the crime and promote disrespect for the law. The presentence report on Tlamka, which we have reviewed, describes a 62-year-old man without any criminal record except several minor traffic offenses. He continues to maintain his innocence of any wrongdoing with J.H., and a good number of people, through letters, expressed their view to the trial judge that Tlamka could not have done this. However, as the trial judge observed, the jury determines guilt or innocence.

A sentence imposed within the statutory limits will be affirmed upon appeal in the absence of an abuse of discretion. *State v. Hall*, 242 Neb. 92, 492 N.W.2d 884 (1992). The sentence is not excessive, and we agree with the trial court's rationale that anything less than imprisonment would depreciate the seriousness of the crime. Accordingly, the conviction and sentence are affirmed.

AFFIRMED.

WRIGHT, Judge, concurring.

I concur with the result, but I write separately to address my concerns about the hearsay testimony admitted under the excited utterance exception to the hearsay rule. As the majority notes, there are three basic requirements for this exception: (1) A startling event occurred, (2) the utterance relates to the event, and (3) the utterance was made while the declarant was still under the stress of the event. *State v. Plant*, 236 Neb. 317, 461 N.W.2d 253 (1990). The crucial question here is whether the

witness' statements were made while she was still under stress from the startling event. I do not believe that J.H. was still under stress such that her statements meet the requirements of the exception.

In *Plant*, the court noted that statements of very young children are admitted because it is unlikely that a very young child would fabricate stories of abuse. Numerous jurisdictions have relaxed the requirements that the statement be contemporaneous and spontaneous to the event. The key requirement is the lack of time for conscious reflection. "Because the stress of an assault is present for some time in children after the assault has occurred," the spontaneity requirement has been loosened. *Id.* at 328-29, 461 N.W.2d at 264.

I question whether hearsay testimony in this case should be admitted as an excited utterance. In *Plant*, the court stated that it is not necessary to show that the declarant was visibly excited when the statement was made but that the witness' nervous state is relevant. The evidence in this case does not support a conclusion that the victim was excited or nervous when her statements were made.

The theory of the excited utterance exception is that circumstances may produce a condition of excitement which temporarily stills the capacity for reflection and provides utterances free of conscious reflection. *In re Interest of R.A. and V.A.*, 225 Neb. 157, 403 N.W.2d 357 (1987). To qualify as an excited utterance, J.H.'s statement to the police officer should have been shown to have been free of conscious reflection. It was not. I think the statement was, instead, the result of questions asked by the police officer with whom the child was encouraged to speak. The record does not show that the victim was still under the stress of the event. The record shows that J.H. had related her version of the incident to her parents at least once before she talked to the police officer. When she was interviewed by the officer, her parents stood in the door and she looked to them for encouragement. The officer testified that the child seemed somewhat shy, but that she behaved as a normal 4-year-old would behave and that she was "real easygoing" and seemed "real comfortable" with the

officer. In my opinion, that evidence does not support the requirement that the victim be under the stress of the event.

In *Plant*, three judges concurred. Justice Shanahan stated, "[T]he requirements of the excited utterance exception have been so 'relaxed' that the requirements no longer stand up and have actually collapsed." *Plant*, 236 Neb. at 342, 461 N.W.2d at 271. Justice Grant, who was joined by Chief Justice Hastings, wrote:

> I concur because I believe the statements were admissible under Nebraska's residual hearsay exceptions in Neb. Rev. Stat. §§ 27-803(22) and 27-804(2)(e) (Reissue 1989) for the reasons set out in the majority opinion. I believe, however, that for this court to hold that the child's statements were "excited utterances" extends that doctrine to extraordinary and improper lengths.

*Plant*, 236 Neb. at 343, 461 N.W.2d at 272.

I agree with these concurring opinions. The excited utterance exception has been stretched too far. I believe a proper method for introduction of the statements of a very young child relating to the sexual abuse of the child is by the use of the residual exception to the hearsay rule cited above. Under that exception, the statement does not have to be made while the child is still "excited." The use of this exception has been well documented in *U.S. v. Shaw*, 824 F.2d 601 (8th Cir. 1987); *United States v. Dorian*, 803 F.2d 1439 (8th Cir. 1986); *United States v. Renville*, 779 F.2d 430 (8th Cir. 1985); and *United States v. Cree*, 778 F.2d 474 (8th Cir. 1985). The U.S. Court of Appeals for the Eighth Circuit has recognized that while Congress intended the residual hearsay exception to be used rarely and only in exceptional circumstances, one such exceptional circumstance generally exists when a child abuse victim relates to an adult the details of the abusive events. In these cases, the adult witness' testimony as to the child's statements was more probative than any other evidence because the child was too frightened to testify. Here, the testimony was used as an attempt to validate what the child herself testified to at trial.

The safeguards for use of the residual exception to the hearsay rule are well defined by the requirements for its use. This is contrasted with the use of the "not so excited, not so

contemporaneous, not so spontaneous utterance exception" applied in the present case. Reliability is the key to admission of hearsay. This reliability can be tested in a realistic manner by meeting the requirements for use of the residual exception to the hearsay rule rather than by trying to extend the application of the excited utterance exception to an inappropriate situation, as was done in this case.