STATE OF NEBRASKA, APPELLEE, V. MARTIN JUAREZ, APPELLANT.

528 N.W.2d 344

Filed January 31, 1995.    No. A-94-488.

William C. Peters for appellant.

Don Stenberg, Attorney General, and Joseph P. Loudon for appellee.

SIEVERS, Chief Judge, and HANNON and MUES, Judges.

HANNON, Judge.

The defendant, Martin Juarez, was convicted of conspiring with others to dispense marijuana, a Class III felony, and was sentenced to a term of not less than 12 nor more that 14 years in prison. He appeals, claiming that certain evidence was improperly admitted, that the evidence was not sufficient to support the conviction, and that the sentence was excessive. We conclude that the evidence was properly admitted and that the evidence was sufficient to support his conviction. However, because Neb. Rev. Stat. § 83-1,105 (Reissue 1987) was still in effect at the time the crime was committed, we conclude the minimum sentence is excessive because that sentence was for more than one-third of the maximum authorized for a Class III felony. Accordingly, we affirm the conviction, but set aside the sentence and remand the cause for resentencing in accordance with the applicable statutes.

## THE INFORMATION

The following is a summary of the information under which Juarez was tried. From May 1993 to August 20, 1993, Juarez

unlawfully, with the intent to promote the commission of the crime of delivery of marijuana, agreed with one or more persons including Travis Buechler, Andrew Requejo, Ricardo Pina Tapia, Juvenal Sanchez Ruiz, Jesus Flores, Jose Holguin, Alden John Hill, and others to engage in, solicit, or cause the "commission of the crime of . . . knowingly or intentionally manufacturing, distributing, delivering or dispensing a controlled substance, to wit: Marijuana [and] MARTIN JUAREZ did commit overt acts in pursuance of the conspiracy." The information contains eight paragraphs intended as allegations of overt acts pursuant to the conspiracy.

The information contains allegations that

2. [o]n or about June, 1993, Travis Buechler did receive $200 by Western Union wire in El Paso, Texas from Martin Juarez . . . .

3. On or about August 17, 1993, Martin Juarez did meet with Travis Buechler and Andrew Requejo at a house southwest of Morrill, Nebraska . . . .

. . . .

7. In May, 1993, Martin Juarez purchased a vehicle to be used to transport marijuana.

These allegations are proper allegations of overt acts, and as will be seen in the summary of the evidence, the evidence clearly supports a finding that these acts were committed by Juarez in furtherance of the conspiracy.

The State also alleges other acts which it claims to have been committed pursuant to the conspiracy. However, some of these alleged acts are not clearly proper allegations of overt acts involving Juarez as compared to those contained above and were not established by the evidence. Therefore, these additional alleged overt acts will not be summarized, as it would not be helpful to the understanding of this opinion.

## SUMMARY OF EVIDENCE

A great deal of the record consists of lengthy cross-examinations of two coconspirators. In an attempt to develop the inconsistencies of the coconspirators' respective testimony, the defense conducted an exhaustive cross-examination of them. With these witnesses, the State wisely used every piece of

information available to support them. Juarez does not allege these witnesses were unworthy of belief as a matter of law, and therefore, their credibility was for the jury. Therefore, the summary will not include evidence that served no purpose other than to support or attack the witnesses' credibility. The State also introduced elaborate evidence on the chain of custody of the drugs, other evidence that it seized, and the test results of this evidence. This foundational evidence will not be summarized.

On August 19, Travis Buechler and Andrew Requejo were stopped near Bradshaw, Nebraska, and arrested while in possession of a large amount of marijuana and cash. As a result of information the police obtained from them, the State obtained a search warrant for a home that was located about 1 mile south and 1 mile west of Morrill, Nebraska. During the search of that home, the police found scales and baggies used for packaging marijuana along with 42 pounds of marijuana. Earlier that night, a police officer watching the house had observed a car leaving the house, and he followed. The car was stopped by police, and a search revealed slightly less than a pound of marijuana.

Juarez lives in Torrington, Wyoming, and the evidence did not establish that he had any direct interest in the house located outside Morrill. The owner of the house testified that two laborers who worked for him, Ricardo Tapia and Juvenal Ruiz, lived in the house during 1993 until they were arrested in August. The owner had seen Juarez at the house and thought Juarez was a friend of Tapia's.

Buechler and Requejo both testified for the State after receiving immunity. They testified that they met about 3 months before their August arrest. At the time they were arrested on August 19, they were returning from a trip to eastern Nebraska, where they claimed to have sold between 15 and 45 pounds of marijuana. The police found a duffelbag located in the car containing around 5 pounds of marijuana and $4,000 in cash. Another $1,000 in cash was found in Requejo's wallet.

Buechler testified that just before the trip during which they were arrested, he and Requejo had gone to Torrington to talk to

Juarez. Later, they met Juarez at the house near Morrill, where Juarez gave them the marijuana, most of which they sold in Omaha and some of which they still had in the vehicle when they were arrested. According to them, Juarez had "fronted" the marijuana to them. The record establishes that "fronting" is an arrangement whereby the supplier of marijuana gives the distributor marijuana and the distributor pays for the marijuana after it is sold. Buechler testified they had obtained marijuana from Juarez under such an agreement on at least three different occasions. He testified that on one occasion, Juarez had gone to Omaha with them to sell drugs.

In the instant case, Requejo testified that the $5,000 in cash was obtained from the sale of marijuana that they had obtained from Juarez just before they left for eastern Nebraska. He explained that they only had $5,000 after selling 15 pounds of marijuana in Omaha because he had not obtained all of the money from the buyers.

Buechler testified that on other occasions, he had been in the house near Morrill, that he had seen marijuana in one bedroom, and that he had packaged marijuana in that house in the presence of Juarez. Buechler also testified that in late June or early July 1993, he was supposed to go to Mexico for Juarez and bring back marijuana. He testified that he had been at Juarez' home in Torrington to prepare a motor vehicle for this trip to Mexico. However, when the vehicle, a "Blazer," broke down in New Mexico, he called Juarez, who told him to get the Blazer towed to El Paso, Texas, and to wait at a particular home in El Paso. Buechler then asked Juarez to send him money by Western Union so he could pay for busfare back home. Buechler then returned to Nebraska without having obtained any marijuana.

When Wyoming police searched Juarez' home in Torrington, they found a Western Union receipt that documents the August 13 transaction where Martin Juarez wired $200 to "Travis Vvishuer [sic]" from Torrington, Wyoming, to El Paso, Texas. The code for identification on the wire transfer was Buechler's birth date, and Buechler's testimony corroborated this. However, the inconsistency between Buechler's testimony that he took the trip in June or July and the fact that the receipt

showed the money was wired in August is not explained.

When the police searched the house near Morrill, they found a receipt from a Grease 'N Go oil change establishment that lists the name of Martin Juarez. The police also found a wallet containing an insurance card bearing Martin Juarez' name.

At trial, a woman who works with Juarez' wife testified that she used to work near the Juarez residence and that she had been in the Juarez home. She testified that she had never observed marijuana around the Juarez home.

Juarez' wife testified about her homelife with Juarez, how they financed their modest home, and how they financed a 1993 Saturn automobile that they purchased in 1993. She testified to his work habits and similar matters which tended to establish that Juarez was a respectable family man. She testified Juarez needs an interpreter because he does not speak English well and that he is an undocumented foreigner from Mexico who works seasonally both as a welder and a field hand.

On cross-examination, Juarez' wife testified that a 1971 GMC motor vehicle that she and her husband had purchased in May 1993 was confiscated in New Mexico as a result of being used by a man by the name of John Hill to bring marijuana across the border. The 1993 registration of the vehicle showed the vehicle was registered to Martin Juarez, Route 2, Box 148, Morrill, Nebraska.

In rebuttal, the former owner of the 1971 GMC vehicle that was confiscated in New Mexico testified that he had sold the vehicle to Juarez for $3,000 cash. He testified that the sale took place as a result of Juarez pulling up beside him in the street one day and asking if he wanted to sell the vehicle. He told Juarez that he would sell it for $4,000. The former owner took Juarez' phone number and later called him. They negotiated the price down to $3,000, and Juarez paid with 13 $100 bills and the balance in $50's, $20's, and $10's. Juarez said he had a little bit of extra money, but that was all he could pay because he had to take the rest of the money back to Mexico. The former owner stated he paid $1,500 or $1,600 for the vehicle in 1985.

## ASSIGNMENTS OF ERROR

Juarez assigns seven different errors, but some of these

merely raise the sufficiency of the evidence question in different ways. The brief also contains seven arguments; however, not all of the arguments are the same as the assignments. Absent plain error, an appellate court will address only those issues that are both assigned as error and discussed in the brief of the party alleging prejudicial error. *State v. Garza,* 242 Neb. 573, 496 N.W.2d 448 (1993). The errors that are both assigned and argued are as follows: The trial court erred in (1) admitting evidence seized from the Requejo motor vehicle and from the house near Morrill without first finding the State had established a prima facie case of conspiracy, (2) not determining the evidence was insufficient as a matter of law, and (3) imposing an excessive sentence.

## EVIDENCE IN REQUEJO'S VEHICLE

Over an objection that the evidence was irrelevant, the court admitted into evidence the $5,000 in cash, the marijuana, and the other physical evidence that the State obtained when police searched Requejo's automobile on August 19. Juarez argues the evidence seized from Buechler and Requejo on August 19 and from the later search of the house near Morrill was not admissible because the court did not find that the State had first proven a prima facie case of conspiracy. Juarez' attorney cites the following quote from *State v. Copple,* 224 Neb. 672, 693, 401 N.W.2d 141, 156 (1987), to support his position:

> [F]or admission of a coconspirator's act as evidence against a defendant-coconspirator being tried for a crime *other than the conspiracy itself*, the trial court must first determine whether the State has proved a prima facie case that (1) a conspiracy existed, (2) the defendant and the witness were members of the conspiracy, and (3) the witness' act was done during and in furtherance of the conspiracy.

(Emphasis supplied.)

In the above-quoted statement, it is clear from the words that are emphasized that the Supreme Court was not considering the steps in proving conspiracy. Instead, the court was considering the admissibility of a coconspirator's out-of-court statement under Neb. Rev. Stat. § 27-801(4)(b)(v) (Reissue 1989). Thus,

*Copple* did not involve proof of the crime of conspiracy and therefore is not authority for the case at hand. There is no merit in this assignment.

## SUFFICIENCY OF THE EVIDENCE
*Standard of Review.*

■ A verdict in a criminal case must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support that verdict. Moreover, on such a claim, an appellate court will not set aside a verdict in a criminal case where such verdict is supported by relevant evidence. *State v. Dyer*, 245 Neb. 385, 513 N.W.2d 316 (1994); *State v. Cook*, 244 Neb. 751, 509 N.W.2d 200 (1993); *State v. White*, 244 Neb. 577, 508 N.W.2d. 554 (1993).

■ In determining whether evidence is sufficient to sustain a conviction in a jury trial, an appellate court does not resolve conflicts of evidence, pass on credibility of witnesses, evaluate explanations, or reweigh evidence presented to a jury, which are within a jury's province for disposition. A verdict in a criminal case must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support that verdict. *State v. Schumacher*, 240 Neb. 184, 480 N.W.2d 716 (1992).

On a claim of insufficiency of the evidence, an appellate court will not set aside a guilty verdict in a criminal case where such verdict is supported by relevant evidence. Only where evidence lacks sufficient probative force as a matter of law may an appellate court set aside a guilty verdict as unsupported by evidence beyond a reasonable doubt. *Id.*

*Juarez' Arguments.*

Juarez cites numerous cases which state rules to be used in judging circumstantial evidence and cases which state the rule for considering the sufficiency of the evidence when the conviction rests on circumstantial evidence. He then argues there is only circumstantial evidence linking the possession of the large quantities of marijuana found in Requejo's vehicle and in the house near Morrill to Juarez. Juarez argues that there is no evidence, direct or circumstantial, that he had constructive possession of the marijuana. He argues the evidence fails to establish him as "the marijuana kingpin of western Nebraska

and eastern Wyoming." Brief for appellant at 20. He argues extensively that there is no proof that he was in possession of a controlled substance with intent to deliver. He argues that in this type of case, it is essential that the State present evidence to support a finding that the defendant possessed the controlled substance, used it, or distributed it to others.

Juarez was not charged with possession of marijuana, but with conspiracy to distribute marijuana. Therefore, the State does not have to prove that Juarez was ever in possession of marijuana. However, the testimony of Buechler and Requejo clearly established that in the days prior to August 20, Juarez was in possession of and distributed marijuana to Buechler and Requejo at the house near Morrill. The direct testimony of Buechler and Requejo also established the agreement between the two of them and Juarez to dispense marijuana. Their direct testimony establishes the overt acts of Juarez in giving them the marijuana at the house near Morrill and in wiring $200 to Buechler in Texas in a failed attempt to bring marijuana back from Mexico. The evidence itself is sufficient to establish that they made an agreement to promote and facilitate the commission of the felony of distribution of marijuana. This evidence satisfies the elements of Neb. Rev. Stat. § 28-202 (Reissue 1989). Subdivision (3) of that statute provides that "[i]f a person conspires to commit a number of crimes, he is guilty of only one conspiracy so long as such multiple crimes are the object of the same agreement or continuous conspiratorial relationship."

In *State v. Anderson*, 229 Neb. 427, 435, 427 N.W.2d 764, 770 (1988) (quoting *State v. Lafler*, 225 Neb. 362, 405 N.W.2d 576 (1987)), the Supreme Court stated the following:

" '[A]n overt act, as something done pursuant to a conspiracy, tends to show a preexisting conspiracy and manifests an intent or design toward accomplishment of a crime. . . . An overt act, by itself, need not have the capacity to accomplish the conspiratorial objective and does not have to be a criminal act.' "

The evidence shows that Juarez, Buechler, Requejo, and others did many acts pursuant to the conspiracy, but more importantly, it shows that Juarez did some of the overt acts that

the State alleged in its information.

The evidence is clearly sufficient to establish the alleged conspiracy and some of the overt acts, and therefore, there is no merit in Juarez' contention that the evidence is insufficient to sustain the conviction.

## EXCESSIVE SENTENCE

A sentence within statutory limits will not be disturbed upon appeal absent an abuse of discretion; that is, a sentence within the statutory limits will not be modified as excessive unless the trial court's reasons or rulings are clearly untenable and unfairly deprive the defendant of a substantial right and a just result. *State v. Philipps*, 242 Neb. 894, 496 N.W.2d 874 (1993); *State v. Riley*, 242 Neb. 887, 497 N.W.2d 23 (1993); *State v. Reynolds*, 242 Neb. 874, 496 N.W.2d 872 (1993); *State v. Hall*, 242 Neb. 92, 492 N.W.2d 884 (1992); *State v. Coleman*, 241 Neb. 731, 490 N.W.2d 222 (1992). " '[I]t is the minimum portion of an indeterminate sentence which measures its severity.' " *State v. Haynie*, 239 Neb. 478, 491, 476 N.W.2d 905, 914 (1991) (quoting *State v. Nevels*, 235 Neb. 39, 453 N.W.2d 579 (1990)).

In the case at hand, the sentence is within the statutory limits if the repeal of § 83-1,105 was effective before Juarez committed the crime for which he was sentenced. However, if § 83-1,105 was not repealed at the time Juarez committed the crime, the sentence is not within the statutory sentencing limits that existed when the crime was committed and is therefore improper.

A review of the statutes controlling the sentencing will help in answering this question. The information charged that Juarez and his coconspirators made their conspiratorial agreement from "May, 1993, through August 20, 1993." Juarez was charged with and convicted of conspiracy to distribute marijuana, which is a violation of Neb. Rev. Stat. § 28-416(1) (Cum. Supp. 1992), and that crime is a Class III felony. Neb. Rev. Stat. § 28-105 (Reissue 1989) provides that the penalty for a Class III felony is a maximum of 20 years in prison, a $25,000 fine, or both, and a minimum of 1 year in prison. Section 28-202(4) provides: "Conspiracy is a crime of the same class as

the most serious offense which is an object of the conspiracy . . . ." The indeterminate sentence that the court could impose under § 28-105 was therefore not less than 1 nor more than 20 years.

Before its repeal, § 83-1,105 provided in relevant part:

Except where a term of life is required by law, in imposing an indeterminate sentence upon the offender, the court may:

(1) Fix the minimum and maximum limits of the sentence, but the minimum limit fixed by the court shall not be less than the minimum provided by law nor more than one-third of the maximum term, and the maximum limit shall not be greater than the maximum provided by law.

If Juarez was sentenced under this statute, the maximum sentence that could have been imposed is not less than 6 $\frac{2}{3}$ to 20 years. However, after the repeal of § 83-1,105, no similar limit existed. See, Neb. Rev. Stat. § 29-2204 (Cum. Supp. 1994); 1993 Neb. Laws, L.B. 529; 1993 Neb. Laws, L.B. 627. Juarez was sentenced to imprisonment for an indeterminate term of 12 to 14 years. A minimum sentence of 12 years is considerably in excess of the 6 $\frac{2}{3}$-year limit imposed by § 83-1,105.

It is therefore necessary to determine the date when the repeal of § 83,1-105 was effective. The statute was specifically repealed by L.B. 529. L.B. 529 was approved by the Governor on May 4, 1993, but the act did not contain an emergency clause, and therefore it was not effective until 3 months after the Legislature adjourned, i.e., September 9, 1993. See Neb. Const. art. III, § 27.

Before 1989, Neb. Rev. Stat. § 29-2262 (Cum. Supp. 1988) provided that someone sentenced to probation could be sentenced to 90 days in jail. However, in 1989, the Legislature amended § 29-2262 to provide that such a person could be sentenced to 180 days in jail. See *State v. Spiegel*, 239 Neb. 233, 474 N.W.2d 873 (1991). After the effective date of the 1989 amendment, Spiegel was convicted for having violated the law in 1988, and the trial court sentenced him to 180 days in jail. The Supreme Court stated: "The application of the 1989 amendment to § 29-2262 to crimes that occurred before the

date of the amendment violated the ex post facto clause of Neb. Const. art. I, § 16." *Spiegel*, 239 Neb. at 238, 474 N.W.2d at 877. See *State v. Palmer*, 224 Neb. 282, 399 N.W.2d 706 (1986). The Supreme Court held that the defendant could only be sentenced to 90 days in jail and reduced the sentence to that term.

Generally, when an offense is committed prior to a statutory change, the amendment or new statute is not applicable to that offense. *Berry v. Wolff*, 193 Neb. 717, 228 N.W.2d 885 (1975). A statutory change which imposes a more burdensome punishment than what existed at the time the crime was committed runs afoul of ex post facto principles. *Dobbert v. Florida*, 432 U.S. 282, 97 S. Ct. 2290, 53 L. Ed. 2d 344 (1977). "In a general sense an ex post facto law is one which 'renders an act punishable in the manner in which it was not punishable when it was committed.' " *Palmer*, 224 Neb. at 290, 399 N.W.2d at 715 (quoting *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 3 L. Ed. 162 (1810)).

In the recent case *State v. Martin*, 246 Neb. 896, 524 N.W.2d 58 (1994), the Supreme Court applied the above principles to prohibit the imposition of an indeterminate sentence for second degree murder under § 29-2204 (Supp. 1993) when the crime was committed in 1990 and at that time the law did not provide for an indeterminate sentence for that crime. While the statutes involved in *Martin* were different from those in this case and the time between the criminal act and the effective date of the statute was greater, the principles involved are the same.

Therefore, affirming a sentence that clearly exceeds the statutory sentencing limits that existed at the time the crime was committed would run afoul of the ex post facto provisions of the state and federal Constitutions. Thus, since § 83-1,105 was still in effect on the date the crime charged in the information took place, Juarez should have been sentenced in accordance with that statute, even if the sentencing limit was not in effect at the time Juarez was sentenced for that crime.

We therefore affirm Juarez' conviction, but remand the cause to the district court for resentencing in accordance with this opinion.

AFFIRMED IN PART, AND IN PART VACATED
AND REMANDED FOR RESENTENCING.